**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| FRACTUS, S.A.,<br><br>Plaintiff,<br><br>v.<br> | |
| AT&T MOBILITY LLC,<br><br>Defendant,<br><br>and<br><br>COMMSCOPE TECHNOLOGIES LLC and CELLMAX TECHNOLOGIES AB,<br><br>Intervenor-Defendants. | Case No. 2:18-cv-00135-JRG<br>LEAD CASE |
| SPRINT COMMUNICATIONS COMPANY, L.P., ET AL.,<br><br>Defendants,<br><br>and<br><br>COMMSCOPE TECHNOLOGIES LLC and CELLMAX TECHNOLOGIES AB,<br><br>Intervenor-Defendants. | Case No. 2:18-cv-00136-JRG |
| T-MOBILE US, INC., ET AL.,<br><br>Defendants,<br><br>and<br><br>COMMSCOPE TECHNOLOGIES LLC and CELLMAX TECHNOLOGIES AB,<br><br>Intervenor-Defendants. | Case No. 2:18-cv-00137-JRG |

| | |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>    Defendant,<br><br>and<br><br>COMMSCOPE TECHNOLOGIES LLC,<br><br>    Intervenor-Defendant. | Case No. 2:18-cv-00138-JRG |

**CELLMAX'S UNOPPOSED MOTION FOR LEAVE TO SUPPLEMENT DEFENDANTS' INITIAL INVALIDITY CONTENTIONS TO ADD JONSSON & KARLSSON NRS 1998 CONFERENCE PROCEEDINGS**

## **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................................ 1

II. PROCEDURAL AND FACTUAL BACKGROUND ........................................................ 4

III. CELLMAX HAS GOOD CAUSE FOR SUPPLEMENTATION .......................................... 5

    A. CellMax Has A Legitimate Reason for This Amendment And Has Been Diligent In Supplementing Defendants' Initial Invalidity Contentions ...................... 5

    B. The Supplementation Is Important Because the Jonsson & Karlsson NRS 1998 Article Is Highly Material To CellMax's Invalidity Defense Against The Fractus Patents ........................................................................................................ 7

    C. Fractus Will Not Be Prejudiced By The Supplementation ....................................... 12

    D. No Continuance Of Any Deadlines Is Necessary ..................................................... 13

IV. CONCLUSION .................................................................................................................. 13

CERTIFICATE OF SERVICE ................................................................................................... 15

CERTIFICATE OF CONFERENCE .......................................................................................... 14

# **TABLE OF AUTHORITIES**

**Page**

## CASES

*Alt v. Medtronic, Inc.*,
　No. 2:04-cv-370-LED, 2006 U.S. Dist. LEXIS 4435 (E.D. Tex. Feb. 1, 2006) .................. 4, 12

*Computer Acceleration Corp. v. Microsoft Corp.*,
　481 F. Supp. 2d 620 (E.D. Tex. 2007) ................................................................................. 12

*Intergraph Corp. v. Intel Corp.*,
　No. 2:01-cv-160-TJW, 2002 U.S. Dist. LEXIS 29660 (E.D. Tex. June 18, 2002) .................. 12

*Motio, Inc. v. Avnet, Inc.*,
　No. 4:12-cv-647, 2015 U.S. Dist. LEXIS 139280 (E.D. Tex. Oct. 13, 2015) .......................... 6

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
　467 F.3d 1355 (Fed. Cir. 2006) ............................................................................................ 7

*Tyco Healthcare Grp. LP v. E-Z-EM, Inc.*,
　No. 2:07-cv-262-TJW, 2010 U.S. Dist. LEXIS 143971 (E.D. Tex. Apr. 1, 2010) ............. 3, 12

## STATUTES

35 U.S.C. § 102(b) ............................................................................................................... 2

I. **<u>INTRODUCTION</u>**

Defendant Intervenor CellMax Technologies, A.B. ("CellMax") respectfully moves the Court pursuant to P.R. 3-6(b) for leave to supplement the original Defendants' Initial Invalidity Contentions, served on September 28, 2018, with a single primary reference entitled "Dual Band Base Station Antenna Systems," co-authored by two of CellMax's own engineers. (*See* Declaration of Stefan Jonsson ("Jonsson Dec."), ¶¶2-4, attached hereto as Exhibit A; Declaration of Dan Karlsson ("Karlson Dec."), ¶¶2-4, attached hereto as Exhibit B.) This article was published by the Nordic Radio Society ("NRS") at the Nordic Radio Symposium 1998 in Sweden more than one year before the earliest effective filing date of the Fractus patents-in-suit, making it unavoidable prior art. (*See, e.g.,* Johnsson Dec, ¶4.) Other than on the merits, Fractus will suffer no prejudice from CellMax's supplementation. CellMax, on the other hand, would be severely prejudiced if it is not allowed to add this one additional prior art reference. Moreover, CellMax has been extremely diligent in seeking supplementation, filing the present motion within a week of being allowed to intervene. Accordingly, CellMax respectfully requests permission of the Court to supplement the Defendants' September 28, 2018 initial invalidity contentions with the Jonsson & Karlsson NRS Article. (*See* Exhibit 2 to Declaration of Peter J. Ayers ("Ayers Dec."), attached hereto as Exhibit C.)

Under P.R. 3-6(b), this Court may allow a party to amend its invalidity contentions for "good cause." Here, each factor for determining whether good cause exists weighs in favor of supplementation. First, CellMax has been diligent in filing its motion. CellMax was not named as an original party in this case. CellMax moved to intervene on November 6, 2018 after dozens of its antennas were identified by Fractus in its Preliminary Infringement

Contentions. (*See* Dkt. 95.) The Court granted CellMax's motion on December 7, 2018. (*See* Dkt. 104.) CellMax filed the instant motion just seven (7) days later.

Second, as shown in the invalidity claim charts submitted herewith, the Jonsson & Karlsson NRS Article is an anticipatory prior art reference and is therefore highly material to CellMax's invalidity case. (*See* Ayers Dec. at Ex. 2 (CM1 chart).) As best as CellMax can surmise, Fractus considers itself to be the inventor of a single linear array of "multiband antenna elements" in lieu of side-by-side mono-band antennas. (Dkt. 1, ¶¶16-20.) More than one year before Fractus filed the first of its asserted patents, however, a group of engineers at Allgon Systems AB in Sweden already had designed, built, tested, and published the results of their work on a "Dual Polarized Dual Band Panel Antenna," using a single, linear array of multiband "stacked patch" antenna elements operating simultaneously "at 900 MHz and 1800 MHz" frequency bands. (Jonsson Dec., ¶4, Ex. A at 69.) Not only does this article describe what Fractus now claims to have invented—using the same type of "multiband antenna element" recited in its patents—but it also recognized the exact same benefits—"reduc[ed] costs and tower space." (*Compare id.* at 69 *with* Doc. 1 at ¶14 ("using just one antenna … occupied less space … to lower the cost").) As a result, this single reference, either alone or in combination with the other art already cited in Defendants' initial invalidity contentions, invalidates all the claims asserted against CellMax. (*See generally* Ayers Dec., Ex. 2 (CM1).)

CellMax is uniquely positioned vis-à-vis its customers to proffer the Jonsson & Karlsson NRS Article prior art because two of the authors work for CellMax in Sweden. (*See* Karlsson Dec., ¶2; Jonsson Dec., ¶2.) These two witnesses will be able to testify about the work they did at a prior company called Allgon System AB in Sweden. (Karlsson Dec., ¶3; Jonsson Dec., ¶3.) They also will be able to testify about how they published their findings on

October 19, 1998 in the proceedings of a highly regarded telecommunication conference sponsored by the Nordic Radio Society ("NRS") in Sweden--the Nordic Radio Symposium 1998 in Saltsjöbaden, Sweden.  (Karlsson Dec., ¶4; Jonsson Dec., ¶4.)  This is a material addition to the body of prior art already produced by the Defendants and is particularly unique to CellMax.

Third, there is no prejudice to Fractus from the proposed supplementation. Less than a week after CellMax was permitted to intervene, CellMax promptly notified Fractus of its intent to supplement the Defendants' invalidity contentions, even before Fractus served its preliminary claim constructions. (Ayers Dec., Ex. 10.)  Fractus also was already aware of other Allgon patents and printed publications by some of the other prior-art coauthors, which Defendants identified and charted in their initial invalidity contentions. (*See* Ayers Dec., Ex. 3 at 83 ("Lindmark"); *see also id*., Ex. 4 ("Lindmark Publication"); Ex. 5 ("Lindmark" patent).) Indeed, Fractus does not even oppose CellMax's motion.

In contrast to Fractus, CellMax will be severely prejudiced if it is unable to supplement Defendants' contentions.  CellMax continues a long, rich tradition of Nordic cellular communication equipment companies that includes the likes of Ericsson, Nokia, Telia, and, of course, Allgon.  Precluding CellMax from relying on the Jonsson & Karlsson NRS Article would severely hamstring CellMax's ability to narrate this tradition with its own first-hand witnesses.

This Court has routinely found good cause to supplement invalidity contentions under similar circumstances. *See, e.g., Tyco Healthcare Grp. LP v. E-Z-EM, Inc.*, No. 2:07-cv-262-TJW, 2010 U.S. Dist. LEXIS 143971, at *1 (E.D. Tex. Apr. 1, 2010) (granting leave to add a new prior art patent six months before jury selection and finding that "Plaintiffs have sufficient

3

notice of defendants' invalidity positions"); *Alt v. Medtronic, Inc.*, No. 2:04-cv-370-LED, 2006 U.S. Dist. LEXIS 4435, at *16 (E.D. Tex. Feb. 1, 2006) (finding good cause despite defendant seeking to add eight new references seven months after serving its invalidity contentions and after the conclusion of the *Markman* hearing). As in those cases, there is also good cause for supplementation here. CellMax respectfully request that the Court grant leave for CellMax to serve its proposed supplemental invalidity contentions.

II.     **PROCEDURAL AND FACTUAL BACKGROUND**

Fractus filed four separate complaints against AT&T, Sprint, T-Mobile, and Verizon (the "Carriers") on April 9, 2018. The Court consolidated the cases for all pretrial issues (except venue), designating the AT&T case as the lead case. (Dkt. 19.) The Carriers filed answers to the various Complaints on June 15, 2018 (*see* Dkt. 30, 32, 42, 44), and the Court held a Scheduling Conference on July 2, 2018. On August 2, 2018, the Court entered a Docket Control Order setting the following deadlines: claim construction hearing--March 25, 2019; close of fact discovery--April 15, 2019; close of expert discovery--May 30, 2019; and jury selection—September 9, 2019. (Dkt. 78.)

Fractus served its infringement contentions on the Carriers, pursuant to P.R. 3-1, on June 18, 2018. (Dkt. 55.) In these contentions, Fractus accuses hundreds of different antennas from 11 different companies of infringing over a hundred and sixty (160) different claims across its ten (10) patents-in-suit. (*See* Dkt. 79-9.) Of those, Fractus contended that some 26 different CellMax antennas infringe over one hundred different claims. (*See* Dkt. 95-16.)

On September 9, 2018, CellMax understands that the Carriers served their Initial Invalidity Contentions pursuant to P.R. 3-3 and the Docket Control Order. (Dkt. 86.) CellMax came to learn, in those contentions, Carriers identified dozens of prior art references as material

to the patentability of the 160+ asserted claims across all ten (10) patents-in-suit. Among those references were at least two publications related to work performed at Allgon: (1) U.S. Pat. No. 6,054,953, entitled "Dual Band Antenna;" and (2) Björn Lindmark, "A Dual-Polarized Dual-Band Microstrip Antenna for Wireless Communications," 1998 IEEE Aerospace Conference Proceedings, (Mar. 28, 1998). (*See* Ayers Dec., Ex. 3 at 83 (describing "Lindmark" prior art); *id*. at Exs. 4-5.). Defendants' invalidity contentions included a claim chart mapping these Allgon references against the asserted claims, as required by P.R. 3-3(c). (*Id*., Ex. 6 ("A22").)

On November 6, 2018, CellMax moved to intervene in the case to protect itself and, indirectly, its customers. (Dkt. 95.) The Court granted CellMax's motion one week ago on December 7, 2018. (Dkt. 104.) Within a few days of being granted leave to intervene, CellMax notified Fractus of its intent to supplement Defendants' invalidity contentions and provided Fractus with a copy of supplemental invalidity charts based on the Jonsson & Karlsson NRS article. (Ayers Dec., Ex. 10.) CellMax secured Fractus's consent to this motion on December 14, 2018 and CellMax filed it the same day.

### III. CELLMAX HAS GOOD CAUSE FOR SUPPLEMENTATION

This Court has broad discretion to grant leave to amend invalidity contentions. The Court consider four factors to determine whether a party has shown good cause to amend its invalidity contentions: (1) the reason for amendment after the Court's deadline for invalidity contentions and whether the party has been diligent; (2) the importance of the amendment; (3) the potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. All these factors weigh in favor of allowing CellMax to supplement the invalidity contentions in this case.

### A. CellMax Has A Legitimate Reason for This Amendment And Has Been Diligent In Supplementing Defendants' Initial Invalidity Contentions

CellMax is new to the case. It was not a party when the Carriers served their invalidity contentions on September 9, 2018. CellMax did not participate at all in the preparation of these contentions. In fact, CellMax currently has no idea of the efforts that the Carriers went to in searching for prior art. It was only provided a copy of the contentions after it moved to intervene in the case. Even then, CellMax's attorneys could not see all the attachments because some were subject to the Protective Order in the case.

Once involved in the case, CellMax identified the NRS 1998 Symposium Proceedings because two of the engineers who co-authored one of the papers now work for CellMax. (Karlson Dec., ¶2; Jonsson Dec., ¶2.) These two engineers, Stefan Jonsson and Dan Karlsson previously worked for Allgon on the development of a "Dual Band Base Station Antenna" that operated at both the GSM (900 MHz) and DCS (1800 MHz) bands. (Karlsson Dec., ¶3; Jonsson Dec., ¶3.) In 1998, they co-authored a paper describing the design and testing of that antenna. (*Id*.) That paper was submitted to the Nordic Radio Society ("NRS") and published as part of Nordic Radio Symposium 1998 Conference Proceedings on October 19, 1998. (*Id*.) CellMax quickly recognized the relevance of this prior art to Fractus's "multiband antenna array" patents.

Once CellMax was permitted to intervene, it almost immediately notified Fractus of its intent to supplement. (Ayers Dec., Ex. 10.) It filed the presentation motion less than a week later. (*Id*.) This timeline clearly demonstrates CellMax's diligence in pursuing its invalidity defense. *See Motio, Inc. v. Avnet, Inc.*, No. 4:12-cv-647, 2015 U.S. Dist. LEXIS 139280, at *6-12 (E.D. Tex. Oct. 13, 2015) (granting motion for leave to supplement invalidity contentions where defendants timely notified plaintiff of the prior art and moved for leave to supplement). Denying this motion under these circumstances would "conflict with the spirit, if not the letter, of the broad discovery regime under the Federal Rules of Civil Procedure, especially given the

6

particular importance of discovery in complex patent cases." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006). The first factor thus weighs in favor of granting leave to amend.

  B.  **The Supplementation Is Important Because the Jonsson & Karlsson NRS 1998 Article Is Highly Material To CellMax's Invalidity Defense Against The Fractus Patents**

The Jonsson & Karlsson NRS article is highly material because it either anticipates or, in combination with other references, renders obvious all the asserted claims of the Fractus patents. Briefly, Fractus apparently contends that it was the first to invent an "interlaced or interleaved" multiband antenna array. This "invention" is illustrated in its most basic form in Figure 1 of U.S. Pat. No. 6,937,191 ("the '191 Patent"). (Ayers Dec., Ex. 11 at Fig. 1.) As shown to the right, on the left-hand side of the figure (1a and 1b) is an admitted prior art approach that uses "two classic mono-band arrays which work at frequencies f and f/2 respectively." (*Id*. at col. 3, ll. 18-20.) As Fractus explains in its patents, the spacing between elements in a mono-band array is a function of the "centre frequency" of the array. (*Id*. at col. 4, ll. 23-34.) Because the center frequency of the first array (1a) is twice that of the second (1b), the elements in the second array are spaced apart twice that of the first array.

Fractus's idea was to combine the two "mono-band arrays" into a single array by "the juxtaposition or interleaving" of the mono-band elements of the two arrays. (*Id*. at col. 1, ll. 13-15; col. 3, ll. 18-23 ("multiband interleaved array").) Where the elements in the two arrays "come together" or "coincide," Fractus proposed using a particular type of antenna element called a "multiband antenna" that is capable of "working in the same manner (same impedance

7

and pattern) on the frequencies ['f'] and ['f/2']." (*Id*. at col. 5, ll. 30-35.)  The "positions" of the multiband antenna elements are shown as "black circles located at the centre of a circumference" in Fig. 1c. above (*Id*.)    While the example illustrated above uses the original "mono-band" antenna elements in those positions where the two arrays do not "come together," the '191 Patent explains that "the same multiband antenna" may also be used in place of those mono-band elements. (*Id*. at 3:3-6.)  The purported advantage of using a single array of interleaved antenna elements (as opposed to two mono-band arrays), was "a smaller total number of elements (12 instead of 16)," and a concomitant reduction in the size and cost of the array. (*Id*. at 5:41-45; 1:20-27.)

The '191 patent goes on to explain that these "multiband antenna" elements are different from the "mono-band antenna" elements. (*See id.* at col. 5, ll. 45-53 (providing numerous examples of "multiband antennas … already described in the state of the art").)  Figure 10, for example, illustrates one such "multiband antenna" (called a "stacked patch antenna") designed to work at both "GSM 900 [MHz] and GSM 1800 [MHz]." (*Id*. at col. 3, ll. 64-67.)  As shown in the figure (right), this antenna has two separate radiating patches—one designed specifically to radiate at the lower frequency (i.e., the longer patch below) and one designed specifically to radiate at the higher frequency (i.e., the shorter patch above). (*Id*.)    This idea of using "a single multiband element (the multilevel element) in such positions of the array (those positions in which those of the original mono-band arrays coincide, is one of the *main characteristics of the MIA invention*." (*Id*. at col. 8, ll. 46-50 (emphasis added).)



However, Fractus was not the first to conceive of using a single linear array of stacked-patch multiband antenna elements in lieu of two, parallel mono-band arrays. More than one year before Fractus filed its first patent application, a company in Sweden (Allgon) already had designed, built, tested, and published its results on a "Dual Band Base Station Antenna" that used multiband elements in place of two mono-band antenna arrays. That work was reported out at a 1998 Symposium in Sweden, sponsored by the Nordic Radio Society ("NRS"). (Karlsson Dec., ¶4, Ex. A.) The Allgon "Dual Band Base Station Antenna" operated at both the "900 MHz band" and the "1800 MHz band." (*Id*.at 69.) The authors recognized that such an antenna would benefit cellular carriers who were being forced to transmit and receive at both bands "[d]ue to the capacity problems encountered in the AMPS (824-894 MHz) and GSM (880-960 MHz) systems in Europe and North America." (*Id*.)

To solve this capacity problem, the engineers at Allgon proposed a linear antenna array of seven multiband "stacked patch" antenna elements in lieu of two side-by-side mono-band arrays, as shown below:



Fig. 6. Schematic of the antenna array showing the 7 dual polarized elements.

(Id. at 72.) Each of these elements was capable of transmitting and receiving "simultaneously" in both the lower ("900 MHz") and higher ("1800 MHz") frequency bands. (*Id*. at 69.)

This antenna was not just theoretical; it was built and tested in Sweden. (Karlsson Dec., ¶4.) The Jonsson & Karlsson paper describes the testing of this dual-band antenna array in

Sweden.  The article includes an actual photo of two of the authors next to the antenna site in Sweden where the antenna was installed and tested. (Karlsson Dec., ¶4, Ex. 1 at Fig. 2.)  The article also reports out the "measured …radiation properties and gain" of this dual-band antenna, showing the performance of the antenna across both bands.  (*Id*. at 71.)  All this work was published more than one year before Fractus's earliest priority date in this case. (*Id*.)

CellMax contends that Fractus cannot read its claims onto CellMax's antennas without also reading directly on the Jonsson & Karlsson prior art, as a comparison of Fractus's latest infringement contentions to CellMax's proposed invalidity contention reveals.  Below is a figure taken from one of Fractus's infringement claim charts on one of the CellMax accused products:



(Ayers Dec., Ex. 8 at 5.) In this figure, Fractus purports to show that CellMax starts with two mono-band arrays operating at different frequency bands ("WCS" (green) and "BRS" (blue)) and that, as a result of the "Juxtaposition" of those two antenna arrays, CellMax somehow produces an interim antenna array design (green/blue) where the original mono-band elements "come together."  The elements of that interim design are then somehow "Reposition[ed]" to yield Cellmax's accused antenna (right).[1]  (*Id*.)

---

[1] It is not at all clear how Fractus gets from "Juxtaposition" to "Reposition" or which elements in the hypothetical interim array Fractus contends correspond to the elements in the actual CellMax

Putting aside the merits of Fractus's theory, it reads directly on the Jonsson & Karlsson NRS article. As CellMax illustrates in its supplemental invalidity contentions, the same "Juxtaposition" and "Reposition" steps can be applied to the Allgon dual-band antenna:



(Ayers Dec., Ex. 2 (CM1-6).) In fact, Fractus's infringement "theory" actually maps much more directly on the Jonsson & Karlsson prior art than it does CellMax antenna. First, the Allgon antenna uses the same two frequency bands ("900 MHz" and "1800 MHz") described in the Fractus patents. The center frequencies of these bands are also an integer multiple of each other (i.e., 2), resulting in an integer multiple of the spacings (i.e., 2). The "juxtaposition" step then produces four "positions" where mono-band elements from the two arrays "come together," as shown above. (*Compare* figure above *with* '191 Patent, Fig. 1, above.) Second, in those "positions," the Allgon antenna array uses the same "multiband antenna element," i.e., "stacked patch," described in Fractus's patents. Finally, Jonsson & Karlsson recognize that, by replacing two mono-band antenna arrays with a single multiband antenna array, it "reduc[es] costs and tower space." (Karlsson, Ex. 1 at 69.) This is the same benefit that Fractus now touts.

---

antenna. Nonetheless, as shown below, this theory can be applied even better to the Allgon dual-band antenna described in Jonsson & Karlsson.

The materiality of Jonsson & Karlsson weighs heavily in favor of supplementation. The fact that two of its authors now work for CellMax, also counsels in favor of granting CellMax leave. For these reasons, the second factor favors granting leave to amend.

### C. Fractus Will Not Be Prejudiced By The Supplementation

Fractus also will not suffer any prejudice if the requested amendment is granted. CellMax is only proposing to add a single primary reference. Fractus will not be prejudiced on claim construction. CellMax disclosed its supplemental invalidity contentions before Fractus even served its preliminary claim constructions on December 14, 2018. Moreover, as explained above, this article does not raise any new issues because the Defendants already relied on other Allgon prior art. (Ayers Dec., Ex. 3 at 83.) Accordingly, Fractus will not be prejudiced and CellMax's motion should be granted. *See Intergraph Corp. v. Intel Corp.*, No. 2:01-cv-160-TJW, 2002 U.S. Dist. LEXIS 29660, at *1 (E.D. Tex. June 18, 2002) (allowing supplementation of invalidity contentions because they were "served well in advance of the court's claim construction ruling and well in advance of trial"). *Tyco Healthcare Grp.*, 2010 U.S. Dist. LEXIS 143971, at *1 (granting motion to amend despite the plaintiffs having notice of the new art only after claim construction briefing had completed); *Computer Acceleration Corp. v. Microsoft Corp.*, 481 F. Supp.2d 620, 624-26 (E.D. Tex. 2007) (granting motion to amend invalidity contentions and finding no prejudice to patentee when a new reference was added before claim construction briefs had been filed); *see also Alt*, 2006 U.S. Dist. LEXIS 4435, at *16 (E.D. Tex. Feb. 1, 2006).

On the other hand, CellMax would be severely prejudiced if it were not allowed to supplement the Defendants' invalidity contentions and rely on Jonsson & Karlsson in its defense. This single reference may be dispositive for many, if not all, of the asserted claims of

the Fractus patents. Moreover, this article is personal to CellMax because two of the authors are now working for CellMax. This factor also favors supplementation.

### D. No Continuance of Any Deadlines Is Necessary

The Docket Control Order would not be impacted, and no dates would need to be rescheduled should the Court grant CellMax's motion. Jury selection will not be until September 9, 2019, and the *Markman* hearing will not be until March 25, 2019. (Dkt. 87.) The Docket Control Order also sets the close of fact discovery on April 15, 2019 and expert discovery on May 30, 2019. (*Id.*) Thus, there is no need for a continuance of this litigation. The fourth factor also weighs in favor of amendment.

### IV. CONCLUSION

For the foregoing reasons, CellMax respectfully requests that the Court grant its Motion for Leave to Supplement the Defendants' Initial Invalidity Contentions with the supplementation attached hereto. (*See* Ayers Dec., Ex. 2.)

Dated: December 14, 2018

Respectfully submitted,

LAW OFFICE OF PETER J. AYERS, PLLC

*/s/ Peter J. Ayers*
Peter J. Ayers
Texas Bar No. 24009882
2200 Bowman Avenue
Austin, Texas 78703
Telephone: (512) 771-3070
Facsimile: (512) 520-4459
peter@ayersiplaw.com

*Attorneys for Movant/Intervenor*
*CellMax Technologies, AB*

## **CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that counsel has complied with the meet and confer requirement in Local Rule CV-7(h).  On December 14, 2018, Lead counsel for CellMax, Peter Ayers, corresponded with Lead Counsel for Plaintiff, Michael Ni, and he indicated that Fractus does not oppose CellMax's motion.  None of the other defendants oppose CellMax's motion.

*/s/ Peter J. Ayers*
Peter J. Ayers

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on December 14, 2018.

>*/s/ Peter J. Ayers*
>Peter J. Ayers