```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                         MARSHALL DIVISION

 4   FRACTUS, S.A.,                )(

 5        PLAINTIFF,               )(    CIVIL ACTION NO.

 6                                 )(    2:18-CV-135-JRG

 7   VS.                           )(    MARSHALL, TEXAS

 8                                 )(

 9   AT&T MOBILITY LLC,            )(    SEPTEMBER 20, 2019

10        DEFENDANT.               )(    9:04 A.M.

11   _____

12

13                IN THE UNITED STATES DISTRICT COURT

14                FOR THE EASTERN DISTRICT OF TEXAS

15                         MARSHALL DIVISION

16   FRACTUS, S.A.,                )(

17        PLAINTIFF,               )(    CIVIL ACTION NO.

18                                 )(    2:18-CV-137-JRG

19   VS.                           )(    MARSHALL, TEXAS

20                                 )(

21   T-MOBILE US, INC., ET AL.,    )(    SEPTEMBER 20, 2019

22        DEFENDANTS.              )(    9:04 A.M.

23

24

25
```

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                        MARSHALL DIVISION

 4   FRACTUS, S.A.,              ) (

 5        PLAINTIFF,             ) (    CIVIL ACTION NO.

 6                               ) (    2:18-CV-138-JRG

 7   VS.                         ) (    MARSHALL, TEXAS

 8                               ) (

 9   VERIZON COMMUNICATIONS,     ) (

10   INC., ET AL.,               ) (    SEPTEMBER 20, 2019

11        DEFENDANTS.            ) (    9:04 A.M.

12   _____

13                 IN THE UNITED STATES DISTRICT COURT

14                FOR THE EASTERN DISTRICT OF TEXAS

15                        MARSHALL DIVISION

16   FRACTUS, S.A.,              ) (

17        PLAINTIFF,             ) (    CIVIL ACTION NO.

18                               ) (    2:19-CV-255-JRG

19   VS.                         ) (    MARSHALL, TEXAS

20                               ) (

21   T-MOBILE US, INC., ET AL.,  ) (    SEPTEMBER 20, 2019

22        DEFENDANTS.            ) (    9:04 A.M.

23                        PRE-TRIAL HEARING

24           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

25               UNITED STATES CHIEF DISTRICT JUDGE
```

```
 1  APPEARANCES:

 2  FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                         in minutes of this hearing.)
 3

 4  FOR THE DEFENDANTS:(See Attorney Attendance Sheet docketed
                         in minutes of this hearing.)
 5

 6  COURT REPORTER:     Shelly Holmes, CSR, TCRR
                        Official Reporter
 7                      United States District Court
                        Eastern District of Texas
 8                      Marshall Division
                        100 E. Houston Street
 9                      Marshall, Texas  75670
                        (903) 923-7464
10

11  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                COURT SECURITY OFFICER:  All rise.

2                THE COURT:  Be seated, please.

3                This is a continuation of the pre-trial hearing in

4     the Fractus versus AT&T Mobility matter, what we've

5     commonly referred to on the record as the CommScope trial.

6                We adjourned yesterday evening after having -- we

7     recessed, rather, yesterday evening, having covered

8     pre-trial matters but for the issue of disputed exhibits.

9                The Court directed the parties to continue to meet

10    and confer overnight in an attempt to narrow and streamline

11    any surviving exhibit disputes.

12               It appears we have all the same faces in the

13    courtroom we had yesterday.  I won't formally call for

14    announcements on the record because it appears everybody is

15    well represented.

16               But I will ask at this juncture for an update from

17    the parties as to where we stand on remaining disputes

18    related to the pre-admission of exhibits for the trial.

19               MS. RUIZ:  May I, Your Honor?

20               THE COURT:  Please.

21               MS. RUIZ:  Good morning, Your Honor.  Gabriela

22    Ruiz with Kobre & Kim for Fractus.

23               Your Honor, after meeting and conferring last time

24    on Plaintiff's objections, we've resolved all of the

25    buckets, except for three of them that remain in dispute.

1          THE COURT:  These are Plaintiff's objections to

2    Defendants' proposed exhibits?

3          MS. RUIZ:  Correct, Your Honor.

4          And on Defendants' objections to Plaintiff's

5    proposed exhibits, we've resolved all but five buckets

6    which remain in dispute.

7          THE COURT:  All right.  Why don't you identify the

8    eight remaining buckets of objection -- of objected to

9    exhibits in each of these two categories for me?

10         MS. RUIZ:  Yes, Your Honor.

11         On the Defendants' objections to Plaintiff's

12    exhibits, Bucket 18, there are three exhibits in that

13    bucket that remain in dispute.  It's the one called

14    declarations.

15         Bucket 23A, which is Dr. Long's testing and

16    simulation data, 18 exhibits in that bucket remain in

17    dispute.

18         23B, Dr. Long's summary exhibits, 12 exhibits in

19    that bucket remain in dispute.

20         Bucket 27, expert summaries, two exhibits in that

21    bucket remain in dispute.

22         THE COURT:  You have one more?

23         MS. RUIZ:  Oh, one more, yes, Your Honor.

24         Bucket 41, the carrier purchase contracts, two --

25    two exhibits in that bucket -- I'm sorry, three exhibits in

1    that bucket remain in dispute.

2           Oh, we withdrew one.

3           MR. BREMER:  Yes.

4           MS. RUIZ:  Two exhibits, Your Honor.

5           THE COURT:  Okay.

6           MS. RUIZ:  Plaintiff's objections to Defendants'

7    exhibits, Bucket 3, non-party technical documents, one

8    exhibit remains in dispute.

9           On Bucket 10, which is expert materials, it's

10   mostly resolved, Your Honor, but there's a carve-out for

11   certain exhibits that are testing results which will -- the

12   parties agree would rise or fall with the decision on

13   Bucket 23A.  We would agree that the Court's decision on

14   Dr. Long's testing results would govern this bucket.

15          And on Bucket 18, on Fractus patents, two

16   exhibits remain in dispute.  It's actually one exhibit,

17   but there are two -- two versions of that exhibit, Your

18   Honor.

19          THE COURT:  All right.  Let me ask -- Mr. Bremer,

20   you seem to be up and down in your chair.  What can you add

21   or subtract?

22          MR. BREMER:  Sorry, Your Honor.  I was just going

23   to consult with her for a minute.

24          (Off the record discussion.)

25          MS. RUIZ:  Yes.

 1          MR. BREMER:  I agree.

 2          THE COURT:  Well, as long as you're up, can you

 3     confirm that that's an accurate representation from the

 4     Defendants' side of the room?

 5          MR. BREMER:  Yes, Your Honor, it is accurate.

 6          THE COURT:  Okay.  Well, it appears, given that

 7     you've told me that Bucket 23A regarding objections from

 8     Defendant to Plaintiff's exhibits would govern and control

 9     Bucket 10 of Plaintiff's objections to Defendants'

10     exhibits, then we should apparently start with the

11     Plaintiff's exhibits and the Defendants' objections

12     thereto.

13          Anyone see a reason not to do it that way?  Then

14     we'll start -- we'll start on that side of the ledger, so

15     to speak, and let's begin with Bucket 18 regarding, again,

16     Defendants' objections to Plaintiff's exhibits.

17          Let me hear from Defendant as to what your

18     objections are.

19          And, again, it's the Court's assumption that

20     whether there are one or multiple documents in these

21     buckets, that they all rise or fall in an area of discrete

22     guidance that I can give you across the board, and that's

23     what I want to hear about.

24          MR. COX:  I believe that's accurate, Your Honor.

25          Brady Cox for Defendants here talking about this

1   category that we've labeled declarations.

2           These are declarations made by various

3   representatives of Verizon or AT&T to the FCC in pursuit

4   of purchasing additional spectrum, which is -- and I know

5   you raised, you know, spectrum spend is a thing that, you

6   know, was a little ambiguous yesterday, and I can do my

7   best to explain kind of what it is, is the various

8   carriers, you know, can use these different frequency

9   ranges across the country, but they need to purchase

10  licenses in various discrete geographic regions -- you

11  know, like Harrison County, Verizon has to purchase a

12  license to use 1900 to 1920 megahertz and 1960 to 1980

13  megahertz and so on.

14          And in pursuit of Verizon's application to

15  purchase additional spectrum, they submitted this

16  declaration -- if I could use the ELMO, Ms. Lockhart, thank

17  you -- of -- of William Stone.  And we think that this is

18  within your ruling on spectrum spend on the MIL issue

19  yesterday where the --

20          THE COURT:  Let me stop -- let me stop you for a

21  minute.

22          MR. COX:  Sure.

23          THE COURT:  Is -- is this declaration proposed by

24  Plaintiffs to be admitted as an exhibit during the trial?

25          MR. COX:  That's right.

1          THE COURT:  Is Mr. Stone going to testify in this

2    case?  If so, why do we have a declaration?  And if

3    Mr. Stone is not going to testify in this case, how do I

4    possibly admit an out-of-court statement in writing from

5    somebody that's not going to be here to be cross-examined?

6          I mean, the first question in my mind is how could

7    this possibly be an appropriate exhibit for admission under

8    the rules of evidence?

9          MR. COX:  I can say what I think they're going to

10   say.  You know, he is a Verizon witness, and so they would

11   say that's --

12         THE COURT:  Well --

13         MR. COX:  -- but I'll let them --

14         THE COURT:  -- why don't we let them say what

15   they're going to say.

16         MR. SAUTER:  Thank you, Your Honor.

17         So in terms of hearsay, we would say it's an

18   admission by a party opponent who's not here to testify.

19         THE COURT:  So I gather this gentleman, wherever

20   he is, is not going to be here during the trial?

21         MR. SAUTER:  He -- he is a -- he's a Verizon

22   employee.  He will not be here to testify.  For that

23   particular exclusion -- exception from hearsay, it's

24   actually not even required.  It is a -- an admission by a

25   party opponent, but he won't be here, to my knowledge.

1          THE COURT:  Has he been deposed?  Will there be

2    deposition testimony offered from him?

3          MR. SAUTER:  We do not have deposition testimony

4    of him, Your Honor.

5          THE COURT:  Okay.  Then let's return to whatever

6    the Defendants' basis to object is.

7          MR. COX:  And -- and I will say that Verizon --

8    Fractus initially noticed the deposition of Mr. Stone, and

9    we tabled that as an apex witness deposition, and there was

10   never follow-up on that.

11         THE COURT:  Well, we are where we are, counsel.

12   We can't go backwards.  Let's talk about what we have and

13   whether it is or isn't admissible under the rules.

14         MR. COX:  Right.  And so regardless of the hearsay

15   and whether he could come in, we think that this is also

16   irrelevant.  The only mention of this in the expert report

17   of -- of Mr. Mills is, you know, he says:  As a result,

18   network operators throughout the world have seen

19   significant increases in mobile data utilization --

20         THE COURT:  Slow -- slow down.  I know you can

21   read fast, but slow down.

22         MR. COX:  I will.  Thank you, Your Honor.

23         As a result, network operators throughout the

24   world have seen significant increases in mobile data

25   utilization in recent years.  That's the only proposition

1  for which this is cited in the expert report.  And it goes

2  on about, you know, the -- the explosive --

3          THE COURT:  Pull the -- pull the page up on the

4  ELMO.  Let me see what that footnote relates to.  Okay.  Go

5  ahead.  It's -- it clearly --

6          MR. COX:  It does cite to it.

7          THE COURT:  It does cite to it in the footnote.

8  Okay.

9          MR. COX:  And -- but the proposition for which

10 it's cited, you know, they -- we would stipulate to that.

11 There have been significant increases in mobile data

12 utilization, but the purchase of additional spectrum spend

13 is not a thing that's relevant to the patents at issue in

14 this case.  There's been no argument by any expert that

15 these patents somehow increase capacity or allow Verizon to

16 work on frequencies that they couldn't work on before.

17         You know, Verizon could always have worked on

18 these different spectra, whether they were using single

19 band or multiband antennas.  And so I just don't think it's

20 relevant to anything at issue in this case, Your Honor.

21         THE COURT:  So your objection -- I assume you

22 don't concede to the admission against interest exception

23 to the hearsay rule, but that notwithstanding, your primary

24 argument is relevance?

25         MR. COX:  That's correct, Your Honor.

1          THE COURT:  Is there something in the declaration

2    that you view other than -- other than the substance of

3    what's said and/or admitted to, is there something else

4    that's prejudicial or inflammatory in any way that you're

5    concerned about in the declaration?

6          MR. COX:  There is, Your Honor.

7          So, for example, they talk about the number of

8    subscribers that are on the Verizon network and how that

9    number is increasing and how they are -- the number of

10   bandwidth they are sucking down the network is increasing

11   over time.  And I think those are all kind of large

12   numbers, and Plaintiff wants to paint a picture of, you

13   know, their invention allows, you know, you to download

14   video and -- and -- and that's just not what these patents

15   are about, and we don't want that implication made.

16         THE COURT:  Well, it's always a point of interest

17   to the Court as to whether something like this is offered

18   for a purpose, that purpose is objected to, and then in

19   trial, it gets used for some completely different purpose,

20   and that's what I'm asking about.

21         Let me ask Plaintiffs:  Is there a need for the

22   admission of the entirety of this document, or is there

23   just a section of it that addresses the point you're

24   concerned about?

25         And I'm not assuming you have some hidden purpose

1   you're going to pull it out and use it for as a surprise or

2   ambush.  I just have to -- this is the time for me to ask

3   those questions.

4        MR. SAUTER:  Absolutely.  If I may approach?

5        THE COURT:  Yes, you may.

6        MR. SAUTER:  I can show you -- I actually think

7   this document is highly relevant for exactly the reasons

8   that -- that counsel said, which is it describes why the

9   carriers want to go out and acquire more spectrum.  They

10  need it.  And it goes directly to the value of Fractus's

11  invention to the carriers.  Recall, it allows the carriers

12  to use multiple frequency bands on antenna arrays.

13       So the more demand that the carriers have, the

14  more capacity it needs, the more it needs Fractus's

15  invention.  That is at the heart of our damages theory

16  as -- as a whole.  But putting that aside, there are

17  actually -- I can just point Your Honor specifically to two

18  paragraphs in this declaration that I think are highly

19  important.

20       And -- and before I do, you may recall from our

21  discussion during the Daubert briefing, the concept of

22  future proofing.  So one of the things that the carriers

23  value about Fractus's invention is it allows them to put up

24  antennas that it can use on multiple frequency bands in the

25  future even if they're not today.

1       And so let me -- Paragraphs 12 and 13 of this

2  declaration go exactly to this point.  Mr. Stone

3  acknowledges that it takes a long time even once they

4  get --

5       THE COURT:  Let -- let me just read it quickly,

6  those paragraphs.

7       MR. COX:  Your Honor, may I approach?

8       THE COURT:  I can see it on the screen.

9       MR. COX:  Okay.

10       THE COURT:  Okay.  Anything further from

11  Defendants with regard to this exhibit?

12       MR. COX:  One slight clarification to one exhibit

13  in this bucket.  2838 is a declaration by an AT&T employee,

14  so that -- hearsay because AT&T is not a party to this

15  case, would extra apply then --

16       THE COURT:  Okay.

17       MR. COX:  -- for that exhibit specifically.

18       THE COURT:  Well, as to this declaration and any

19  similar declaration from a party to this case and given

20  what's been argued, I think the -- I think the threshold of

21  appropriate relevance has been met, so I'm going to

22  overrule your relevance objection.  And given that this is

23  from an officer of a party to the case, I'm going to

24  overrule your hearsay objection.

25       So this is pre-admitted, and everything else of a

1  similar nature in this category is pre-admitted.  If you

2  want to show me the particular AT&T document which

3  identifies the declarant, we can talk about that.

4          MR. COX:  Here we have Exhibit 2838, Your Honor,

5  and it's by --

6          THE COURT:  I see it.

7          MR. COX:  -- William -- William Hogg of AT&T

8  Services, Inc., which is not a party to this case.

9          THE COURT:  What's Plaintiff's response to the

10 hearsay objection regarding this declaration?

11         MR. SAUTER:  Your Honor, we would ask the Court to

12 allow this document to be admitted under the residual

13 hearsay objection because there are circumstantial

14 guarantees of trustworthiness.  It was submitted by AT&T in

15 connection with its attempt to acquire T-Mobile, so it's a

16 declaration that speaks about the need for that

17 transaction.  Similar subject matter is the Stone

18 declaration that we just looked at.

19         So it goes to a material fact.  And the probative

20 value of it, I submit, because it is a sworn statement by

21 AT&T talking about the need for spectrum, it outweighs any

22 prejudicial value which counsel still has not identified at

23 all.

24         THE COURT:  Substantively, is this repetitive of

25 what's in the other declarations?  It's just from AT&T?

1          MR. SAUTER:  It's the AT&T version, Your Honor.

2          THE COURT:  Okay.  And is there a specific

3   subsection of Rule 803 you want to cite to me?

4          MR. SAUTER:  If I may return to my desk, I can

5   tell you.  One moment.

6          MR. COX:  And while he's looking for that, Your

7   Honor, can I just add one point?

8          THE COURT:  Go ahead.

9          MR. COX:  I think an issue -- whether this comes

10  in or not is -- what witness it comes in through, since

11  there'll be no AT&T witness at trial to testify or rebut

12  anything in this declaration, I'm not sure what witness it

13  comes in through, except to the extent that it is cited in

14  an expert report.

15         MR. SAUTER:  The rule, Your Honor, is 807(a) is

16  the residual hearsay exception, and I -- I believe this is

17  cited in Mr. Mills's report.  I can find a -- a citation to

18  confirm that.

19         MR. COX:  I'm sure it is in the --

20         THE COURT:  Yeah, I'm sure it is, too.

21         Well, I'm going to sustain the objection as to the

22  AT&T declaration.  I don't find that it's more probative

23  for the point for which it's offered than other evidence,

24  as required by Rule 807.  And, quite honestly, it's one

25  more opportunity to confuse the jury with somebody who's

1  not in the courtroom.

2        And given that it's the AT&T version of what's

3  already in this bucket from the other named and present

4  Defendants, I'm going to sustain the objection to that.

5  But the remainder of the documents, I'll overrule

6  Plaintiff's objection, and they're pre-admitted, all right?

7        MR. SAUTER:  Thank you, Your Honor.

8        THE COURT:  All right.  What's the next bucket?

9  Is this 23A regarding Dr. Long?

10        MR. FINDLAY:  Yes, Your Honor.

11        THE COURT:  Let's proceed to take that up.

12        MR. FINDLAY:  Eric Findlay on behalf of the

13  Defendants, Your Honor.

14        There are a number of testing documents that both

15  Dr. Lang -- Dr. Long, excuse me, for Fractus and Dr. Kakaes

16  for CommScope had run, directed somebody to run, and

17  attached them to their expert reports.

18        We don't have a problem with them being used as

19  demonstratives.  That would be our proposal.

20        Plaintiff's proposal is that they be admitted into

21  evidence as exhibits.  We think that's inappropriate for a

22  couple of reasons.

23        First, this Court's default rule, as I think

24  you've indicated during the pre-trial conference the past

25  couple of days, is, as I think is the norm, that expert

1   reports typically don't come into evidence.  This is just

2   part of the expert report.

3          Specifically on one of the examples, PX-3723,

4   which is a printout of a portion of one of the tests that

5   Dr. Long ran, it's my understanding Dr. Long didn't perform

6   this testing.  He directed somebody else to do it.

7          And, again, that's completely acceptable for an

8   expert to do, and then he or she may rely upon that.  But

9   we don't think it's appropriate to come in as evidence,

10  Your Honor.  And we would submit that these should be used

11  as no more as demonstratives on both sides.

12         THE COURT:  And the -- the specific evidentiary

13  rule that you're raising as regards the objection is what?

14         MR. FINDLAY:  Well, I don't think it's proper

15  evidence.  It's -- it's --

16         THE COURT:  I don't know where that rule is in the

17  rules of evidence, I don't think it's proper evidence.

18         MR. FINDLAY:  It's argument.  It's opinion

19  evidence, so I think it's 401, 403, and I don't think it

20  applies.  And hearsay.

21         Thank you.

22         THE COURT:  Let me hear from Plaintiff.

23         MR. STAMATOPOLOUS:  Good morning, Your Honor.

24  George Stamatopolous with Kobre & Kim for Fractus.

25         So as regards the hearsay objections, there's

1   ample case law that suggests that broad data and test

2   results are not hearsay.  They're not statements offered by

3   a person.

4        Moreover, it's verifiable material.  I think it's

5   pretty standard that broad data is appropriate evidence.

6        As regards the relevance of Dr. Long's test

7   results, which were, in fact -- were, indeed, performed at

8   his direction, this material is -- if not integral, it's

9   very important to proving Fractus's infringement case.  And

10  it would be very helpful for the jury -- Mr. Findlay showed

11  you an excerpt of the raw data.  He showed you in tabular

12  format a number of rows and columns, the data that was

13  generated by a machine when Dr. Long's testing was

14  performed.

15       There's actually graphs that show exactly how the

16  various claim limitations are met, specifically with

17  respect to impedance and radiation patterns.

18       Besides that, yeah, I think the -- I think the

19  hearsay objection is pretty clear that it doesn't -- it

20  really doesn't hold water.

21       THE COURT:  All right.  Thank you, counsel.

22       MR. STAMATOPOLOUS:  Thank you.

23       MR. FINDLAY:  Your Honor, may I?

24       THE COURT:  Very briefly.

25       MR. FINDLAY:  Just on -- okay, just so the record

1   is clear because I might have confused the issue, and if I

2   did, I apologize.

3           On the hearsay objection, Dr. Long didn't produce

4   these.  He didn't run the tests, as I understand.  He

5   directed somebody else to do it.  So I don't think that

6   automatically -- I don't think it's taken out of the

7   hearsay objection.  I think it's still appropriate.

8           THE COURT:  I -- I gather not only did Dr. Long

9   perform the test, Dr. Long did not directly supervise the

10  test being performed?

11          MR. FINDLAY:  Correct.

12          THE COURT:  Some third party outside of Dr. Long's

13  direct supervision and purview performed the test and then

14  sent him this results; is that accurate?

15          MR. FINDLAY:  That's my understanding, yes, sir.

16          THE COURT:  Is that accurate from Plaintiff's

17  standpoint?

18          You know, sometimes it's not Dr. Long but it's

19  Dr. Long's assistant who's worked with him closely for

20  years and is in the same laboratory or building, and

21  sometimes it's a third-party testing laboratory halfway

22  across the country.  So some more context here would be

23  helpful.

24          MR. STAMATOPOLOUS:  Certainly, Your Honor.

25          So it was -- it was a third party.  It was a third

1  party to which Dr. Long sent -- or rather, sent and

2  discussed a very elaborate testing protocol.  Also,

3  Dr. Long visited the facility.  He met with the people

4  performing the tests.

5           So we submit, Your Honor, that the -- the tests

6  were performed at his direction.  They're reliable.  And to

7  the extent Defendants question the reliability of the

8  tests, that should have been raised, I think, in a Daubert

9  motion, as opposed to an objection with respect to the

10 specific materials that we propose be admitted into

11 evidence.

12          THE COURT:  All right.

13          MR. STAMATOPOLOUS:  Thank you.

14          THE COURT:  I'm going to sustain the objection to

15 Bucket 23A.  At a high level, Dr. Long's going to testify.

16 His report has been provided.  These are matters he'll

17 testify directly from the stand on.

18          And to the extent this supporting documentation is

19 helpful to the presentation of his oral testimony, he's

20 certainly entitled to use these exhibits attached -- or

21 these attachments to his report as demonstratives.

22          But I don't think they should be admitted as

23 actual exhibits in the case.  And I'll sustain Defendants'

24 objection to Bucket 23A.

25          MR. WARD:  And, Your Honor, just so we're clear,

1  you're sustaining the hearsay or relevance or --

2       THE COURT:  Primarily the hearsay.  There's human

3  input involved.  This was done by somebody that is not here

4  to testify about what they did or how they did it.

5  Dr. Long may have said I want you to do X.  Dr. Long wasn't

6  there to see that they did X.  They sent back their

7  results.  Dr. Long doesn't have personal knowledge of how

8  the test was done.

9       I think there is a -- I think there is a valid

10 hearsay objection here.  And at a high level, I also think

11 that you need a strong reason to start pulling pieces out

12 of hundred-plus page exhibit -- reports and making them

13 exhibits in trial when you're going to have the witness

14 there who is the knowledgeable person and who's going to

15 testify about their conclusions and the basis for it.

16      All right.  That objection is sustained.

17      Let's go on to 23B.  And I assume that will also

18 cover Bucket 10 on the other side of the ledger, but we'll

19 get to that shortly.

20      MR. FINDLAY:  Okay.  Thank you, Your Honor.

21      THE COURT:  23B is next.

22      MR. FINDLAY:  Yes -- yes, sir.

23      These are summaries that Fractus intends to admit

24 as evidence, which we do not think is appropriate.

25      And I'll start with the rule, FRE 1006, summaries

1   to provide content.  It does say that a proponent may use a

2   summary chart or calculation to prove the content of

3   voluminous writings, recordings, or photographs that cannot

4   be conveniently examined in court.

5          I don't even think we get to that point, Judge,

6   because we would submit that these are not summaries of

7   voluminous writings.  They are summaries of their expert's

8   opinion, which they want to have risen or elevated to the

9   level of an exhibit.  And they contain argumentative and

10  opinion materials, as well.

11         If I could show one, 5356, this is from Dr. Long's

12  report.  It's accused product information, frequency bands,

13  ports, polarization, and antenna elements.  And as I

14  understand it, Your Honor, the colors that we see here, the

15  squares drawn around the elements, red circles, there's

16  some -- it's hard to see on the ELMO.  There's some blue

17  outlining, as well.  All of that, I believe, are inputs

18  from Dr. Long or from counsel that prepared these with

19  Dr. Long.  And it goes throughout the document like that.

20         So it is not, I think, what is classically thought

21  of as a summary of voluminous records.

22         What I was trying to find a couple of cases --

23  it's interesting, most of the cases on 1006, if my research

24  was correct, fall on the criminal side of things.  But

25  there was one case in the Eastern District awhile back with

1    Judge Steger where he allowed a summary in, but it was a

2    summary of a 94,000-page New Drug Application to the

3    Federal Drug Administration in a products liability case,

4    something which I think seems much more at the heart of

5    what 1006 is designed to get at, not allowing a party to

6    summarize an expert's arguments.  And we --

7             THE COURT:  Mr. Findlay, hand me that document.  I

8    can just see a part of one page on the ELMO.  I'd like to

9    look at the entirety of it.

10            MR. FINDLAY:  Certainly.

11            THE COURT:  All right.  I'll hand it back to

12   Ms. Lockhart, and you can retrieve it from her.

13            MR. FINDLAY:  Thank you, Your Honor.

14            THE COURT:  Let me hear a response from Plaintiff.

15            MR. STAMATOPOLOUS:  So, Your Honor, the document

16   that Defendants object to is a summary -- we submit is a

17   proper summary exhibit.  It doesn't contain any opinions.

18   Really what it does is it excerpts information from a

19   number of different sources that pertain to each of the

20   accused products, and it presents them in tabular format.

21            So there's -- there's about 85 products in the

22   case.  Each one has three or four associated documents.

23   And the relevant information in those documents consists of

24   information, such as the polarization of the array, the

25   number of ports, the specific arrangement of the antenna

1   elements in an array which can be -- or rather, which can

2   be gleaned from drawings -- product drawings.

3          So the only thing that is not really a direct

4   excerpt from one of these types of documents are the

5   squares and the circles that Mr. Findlay pointed to.  And

6   Fractus suggested yesterday during the meet and confer to

7   Defendants that we'd be willing to modify the exhibits to

8   remove those circles and squares and leave the drawing

9   excerpt in its original form.

10         We think that this would be very helpful to the

11  jury to summarize the information.  This is information

12  that pertains to each and every one of the accused

13  products, rather than hand them thousands of pages of

14  documents -- not 90,000 pages like the case that

15  Mr. Findlay just discussed, but still several hundreds or

16  maybe a couple thousand pages.

17         THE COURT:  And tell me again what the suggestion

18  was during the meet and confer.

19         MR. STAMATOPOLOUS:  The suggestion was that we

20  modify the exhibit, such that these circles and squares,

21  which were our input to show where the various antenna

22  elements were located on the arrays, that those be removed.

23         THE COURT:  Okay.

24         MR. STAMATOPOLOUS:  Thank you.

25         THE COURT:  Do you have anything else,

 1   Mr. Findlay?

 2            MR. FINDLAY:  Yes, Your Honor.  Thank you.

 3            The -- the meet and confer comment is correct, but

 4   that's not the only objectionable part -- objectionable

 5   part of the exhibit.

 6            THE COURT:  I gather not or that would have

 7   resolved it.

 8            MR. FINDLAY:  Yes, Your Honor.  If you look at the

 9   fourth column, dual polarization, for some of the products,

10   as I understand it, that's an element of a claim, and he's

11   writing yes through all of that.  That seems completely

12   argumentative.  It's not something that ought to be

13   elevated to the level of evidence.  It's fine for them to

14   use this as a demonstratives exhibit, and they can argue

15   about it that way, but for that -- for a conclusion like

16   that to go back to the jury, we don't think is appropriate.

17            And may I test Your Honor's patience with another

18   exhibit from this bucket?

19            THE COURT:  All right.

20            MR. FINDLAY:  Thank you.

21            Another one -- and, again, this is from Dr. Long's

22   report.  And this is 5366.  And I -- if Your Honor wants to

23   see this, I can hand it up.  It -- it's a printout, it's

24   too long of a docket to get on an eight and a half by

25   eleven sheet of paper.  But it's looking at different

1    CommScope products, the models, it has specifications, it
2    has spacing information, but this is also an attempt -- for
3    all -- for the same reasons that I said for the other
4    exhibit, it applies here, it's argumentive, it's opinion.
5    They're also, we believe with this exhibit, trying to
6    backdoor opinions that are lacking in Dr. Long's report.
7            If you look at Column 3, working frequency band,
8    he's identifying WCS.  And this particular exhibit -- I
9    want to make sure I get this right -- I believe is a
10   summary of Appendix 3 from Dr. Long's T-Mobile expert
11   report.
12           In that appendix in his report, Dr. Long never
13   identified WCS as a working frequency band for T-Mobile.
14           And there's another exhibit, 5367, which is a
15   similar exhibit but submitted on behalf of Verizon, if you
16   will.  And similarly there, he identifies WCS as a working
17   frequency band, yet he never did that in the actual
18   appendix of his report.
19           So it's summary, it's opinion, it's trying to be
20   jazzed up as -- as evidence, plus it's adding new opinions,
21   Your Honor.  And these -- obviously, these were not
22   prepared specifically by Dr. Long, so I think hearsay
23   applies.  And I think it would be prejudicial, as well.
24           THE COURT:  Are you aware in any way, Mr. Findlay,
25   that this is going to be inconsistent with what Dr. Long is

1  going to testify to in open court and with what's otherwise

2  clearly set out in his report?

3        MR. FINDLAY:  With respect to the first one that I

4  showed you, 5356, no, I don't know of anything that's

5  inconsistent with that that will be in his testimony.

6        However, with the other one, 5366, that, we

7  submit, is inconsistent with his report because, again, it

8  identified this different working frequency band which he

9  didn't identify as T-Mobile or in T-Mobile or Verizon

10 products in his report.

11       But -- and I guess, Your Honor, the last thing

12 I'll say, that goes to our larger point.  It's fine for him

13 to argue this.  It's fine for him to show it to the jury,

14 and they can go through it, but it should be a

15 demonstrative, not elevated to evidence.

16       THE COURT:  Anything further from Plaintiff on

17 this?

18       MR. STAMATOPOLOUS:  Yes, Your Honor.  As an

19 initial matter, the polarization column that Mr. Findlay

20 pointed to does contain the words -- the word "yes"

21 throughout.  The reason it contains the word "yes"

22 throughout is because each and every one of the accused

23 products have data sheets, and each and every one of those

24 data sheets says that the product has polarization, plus

25 and minus 45 degrees in each of its arrays and in each of

1    its frequency bands.

2           So all Dr. Long is doing is putting that

3    information at the very top with a question mark, and then

4    answering in the affirmative to show that each of the data

5    sheets has that information in it.

6           Secondly, with respect to the second exhibit that

7    Mr. Findlay addressed, the Excel sheet of which he showed

8    you a printout, Dr. Long is not rendering an opinion that

9    T-Mobile or Verizon are operating in the particular

10   frequency band, WCS, that Mr. Findlay pointed out.  Rather,

11   Dr. Long is opining that the product, in terms of its

12   technical -- technical capabilities, can cover that

13   particular frequency band.

14          So it's really product analysis.  It's consistent

15   with the analysis that he performed earlier in the case in

16   his reports.  There's -- there's no issue of inconsistency

17   in our opinion.

18          Thank you.

19          MR. TOBIN:  Your Honor, may I very, very briefly

20   offer a quick response to that?

21          THE COURT:  On the one hand, I don't want to

22   curtail anybody.  On the other hand, we don't have time for

23   everybody in the room to go to the podium and put in their

24   two cents.  Understanding I'm not opening the door to that,

25   counsel, I'll give you just a very brief second to add what

1  you have.

2       MR. TOBIN:  I'll be incredibly brief, Your Honor,

3  and thank you for the indulgence.

4       A few other claim terms that are used in that

5  chart in the headings are terms like "antenna element,"

6  "array," "frequency band."  Each of those are claim terms,

7  and so in a sense, this is Dr. Long showing the claim terms

8  and where the products are.

9       One other issue is that there's an aspect of

10  cherry picking where he's taking a little piece of this

11  schematic that's helpful but not other pieces of the

12  schematic.

13       Thank you, Your Honor.

14       THE COURT:  Well, on the one hand, the Court's

15  acutely aware of the possibility of voluminous documents

16  being used without the ability to summarize.  On the other

17  hand, I think the requirements of Rule 1006 preclude those

18  summaries being more than a representation of what's in the

19  underlying documents.  I think what you've shown me falls

20  slightly on both sides of the line.

21       What I mean by that is the first document you

22  showed me, I think, with the drawings taken out, as was

23  proposed, is fine because it appears to be just a summary

24  of the underlying data and information.

25       The second document appears to contain opinions of

1   the expert which go beyond the underlying substance of the

2   summarized voluminous documents and falls on the side of

3   the line that includes argument which is not appropriate

4   under Rule 1006.

5        So at least as to what you've shown me in this

6   bucket, the first document with the removal of the drawings

7   is pre-admitted.

8        The second document with the commentary set forth

9   therein from the expert, and because of that, is not

10  pre-admitted.

11       And if you need further guidance on remaining

12  documents in this group, then you need to tell me.  If not,

13  I'll assume that's adequate, and we'll move on to the next

14  category.

15       MR. FINDLAY:  I think we can take that ruling and

16  work it out between the parties, Your Honor.

17       MR. WARD:  And, Your Honor, we'll -- we'll

18  certainly meet with the other side and try and figure that

19  out.  I just -- the combination of the last two rulings

20  with result -- with regard to the test results from the

21  85 accused products and now the disallowance of some of

22  these summaries is going to make it difficult with the time

23  that the Court has allowed to put on an infringement case.

24       The plan was to say, here are the test results,

25  the impedance patterns from Product X.  Did you do that

1  with respect to the other four -- 84 products?

2       Yes, I did.

3       Are those contained in Exhibits 2 through 85?

4       Yes.

5       I mean, those are integral to the infringement

6  proofs.  They were part of the expert report.  I understand

7  your ruling.  I just want to know -- it's hard for you to

8  see where -- in the big picture where these things are

9  taking us.  And I just want to make you aware of that in

10 case -- when we get together and we might be coming to you

11 saying we need more time, then, if we're not going to be

12 able to summarize some of these voluminous documents that

13 Dr. Long relied upon to establish his infringement proof.

14      THE COURT:  Well, on the one hand, you just cut

15 the case down to one patent.  So you should be saved -- you

16 should have saved some time there.  On the other hand, your

17 expert can testify to everything that's set forth in these

18 documents.  And he can use those documents as a

19 demonstrative.  The only issue here is should they rise to

20 the level of being admitted as an exhibit in the case.

21      MR. WARD:  And --

22      THE COURT:  And there, I have to be constrained by

23 the rules of evidence.

24      MR. WARD:  And I understand your ruling, Your

25 Honor.  My only concern is I think we can convey all this

1  information to the jury.  They're going to understand it.

2  But I fear that when this case goes up on appeal, if that's

3  where it ends up, they're going to say there's no evidence

4  of infringement with respect to every product because

5  Dr. Long shorthanded it during his -- his testimony.  And

6  there's not any test result for every product.  There's

7  only one for the one that he discussed.  And he said:

8  Yeah, I did the same for 84 other products.

9          THE COURT:  Well, why don't you do this, Mr. Ward?

10 Why don't you continue to meet and confer with the other

11 side, because, quite honestly, the objections I heard were

12 not to the substance of the underlying material.  They were

13 to additional argument and -- and characterization added to

14 them.  And, quite honestly, you may be able to work this

15 out to where they are pre-admitted if you remove those

16 offending categories or columns.  That's really why I've

17 granted the objections I've granted.

18         MR. WARD:  I hear you, Your Honor.  And we'll

19 continue to work on that.

20         THE COURT:  Okay.  Well, barring something

21 different, that's the Court's ruling on this category.

22         What's the next category?  Is this 27?

23         MR. FINDLAY:  Yes, it is, Your Honor.

24         THE COURT:  Okay.

25         MR. BARTON:  Ross Barton, Your Honor, on behalf of

 1   the Defendants.

 2            This is a different type of expert summary problem

 3   that we have.  There are two specific documents that fall

 4   into this bucket.  They are two one-page documents, and

 5   they're marked highly confidential.

 6            So instead of publishing on the ELMO, I'm happy to

 7   approach and give you copies for the purposes of this

 8   discussion, Your Honor.

 9            THE COURT:  You may approach.

10            MR. BARTON:  So, Your Honor, taking PX-5086 for

11   purposes of -- of this discussion as the exemplar, this is

12   a document that was produced to us after the close of fact

13   discovery, after the close of expert discovery in

14   connection with an opposition to a Daubert motion.

15            THE COURT:  Do you have an additional copy you can

16   put on the ELMO?

17            MR. BARTON:  I do.

18            THE COURT:  I mean, these are just two single

19   pages.

20            MR. BARTON:  And if I could -- well, you know,

21   let's just -- we'll -- we can do it for Verizon.  I'll

22   allow it to be published for purposes of this discussion,

23   Your Honor.  If it's moved into the record, we may need to,

24   you know, seal the courtroom if there's going to be

25   testimony about this just because the numbers on the

 1  right-hand side.

 2          THE COURT:  Well, I don't see any witnesses here.

 3  I don't expect any testimony.  There might be some

 4  argument, but there's not going to be any testimony.

 5          MR. BARTON:  Fair enough.

 6          So, Your Honor, what we're dealing with here is

 7  summary data that was apparently produced or prepared by

 8  Dr. Mills.  And Dr. Mills is Fractus's damages expert.

 9  This was not part of his report.  He did not discuss the

10  ATOLL data.  And when I say ATOLL, ATOLL is a database.

11  It's a tool that Verizon has that keeps track with varying

12  degrees of accuracy of the things that are employed in

13  Verizon's network.  It is voluminous.  We would agree with

14  that.  There are about 116 different documents -- Excel

15  spreadsheets that were produced in this case, with as many

16  as 370 columns per spreadsheet and tens of thousands of

17  entries.

18          And what we have here is a document that was given

19  to us, and it turns out that it was prepared by Mr. Mills.

20  We only found out about that when they told us that in an

21  opposition to one of our motions in limine.

22          What Mr. Mills purports to have done here is to

23  take information from the ATOLL database and show there,

24  for example, in Column -- or Row 1, the number of accused

25  antennas that operate both AWS and PCS frequency bands.

1   And then he has an antenna count on the right-hand column.

2         There's a number of issues with this, Your Honor.

3   First, Federal Rule 1006 is a summary to prove content.

4   And I think when you look at the instances in which

5   summaries are properly used, those are instances where

6   there are, for instance, voluminous sales invoices that

7   show units sold, things of that nature.  And someone has

8   gone through, aggregated those up, and then uses that to

9   summarize the data.

10        That's not what's shown here.  That -- Row 1, Row

11  2, Row 3, those are not fields in the ATOLL database.

12  Those are -- those reflect Dr. -- or Mr. Mills's

13  conclusions regarding what the ATOLL database shows.

14        THE COURT:  Isn't -- isn't Mr. Mills going to

15  testify both as a fact witness and as an expert witness in

16  this case, and is this going to fall within his expert

17  testimony, or is this going to fall within his fact

18  testimony?

19        MR. BARTON:  It cannot fall within his expert

20  testimony, Your Honor, because he did not discuss this in

21  his expert report.  This would be outside the scope of his

22  report.

23        THE COURT:  So this will be presented when he

24  testifies as a fact witness?

25        MR. BARTON:  That is their theory, although it's

1   unclear how he can possibly testify as a percipient fact

2   witness as to how Verizon's network is deployed and what

3   the contents of these documents that were produced by

4   Verizon actually show.

5        THE COURT:  He's not going to be able to say I

6   counted the number of these, and that's how I got 87,782?

7        MR. BARTON:  If --

8        THE COURT:  And say I looked through all the

9   voluminous documents, and I counted them, and this is what

10  the -- is reflected.

11       MR. BARTON:  Your Honor, there are judgment calls

12  reflected in here, and those judgment calls were pushed out

13  into the area of expert testimony.  This is not simple

14  facts.

15       And -- and to get to that point, Your Honor, we

16  tried to reproduce this.  We tried to go through and see if

17  we could get to the same numbers, if there was any way to

18  do that.  And not only could we not get to those numbers,

19  we couldn't even figure out how to begin to do that, right?

20  This is not something where he just went through and

21  counted because these are not fields that exist.

22       And -- and one point that I would make with

23  respect to this document, is you see there the source down

24  at the bottom.  He identifies the two things, one is the

25  ATOLL spreadsheets produced by Verizon, which is a Bates

1  range.  And then two is a transcript deposition of Nicholas

2  Cordaro.  So he's having to take some information provided

3  to him in the deposition transcript of a Verizon employee,

4  apply that, and then make judgment calls based on the

5  contents of this document.  That is not fact testimony,

6  Your Honor.  That is expert testimony.

7           And another thing that I would point out, Your

8  Honor, is this is not a document that was produced to us

9  during discovery.  It was not produced to us prior to

10  Mr. Mills's deposition.

11          So we had no opportunity to examine him on how he

12  got to this set of values, how he figured out what he was

13  counting, and what he wasn't counting.

14          And, for example, Your Honor, I think it's

15  important to note, in the ATOLL database, for example,

16  there are thousands of rows of entries that are identified

17  as junk or decommissioned.  We have no idea if he counted

18  those.  It's not clear to us.  If he did, those are very

19  problematic.  But, again, we never had an opportunity to

20  depose him on that.

21          One additional issue, I would say, Your Honor,

22  with respect to T-Mobile is there's Document 5085.  And for

23  the source data that he identified on that exhibit, in his

24  deposition, Mr. Mills, when testifying about the data that

25  T-Mobile had previously produced that he then subsequently

1  used as a source in this document that was created after

2  his deposition, he testified that that data was not

3  reliable.

4        And so it strikes us as -- as deeply problematic

5  for him to say now I'm fact witness and I can provide you

6  my opinion about Verizon's network or T-Mobile's network

7  and their documents as a fact witness without having to

8  demonstrate that he has any basis to testify as a fact

9  witness or giving us any opportunity to cross-examine him

10  on how he made the decisions he had to make in order to

11  come up with these numbers.

12        THE COURT:  All right.  Let me hear from the

13  Plaintiff.

14        MR. SAUTER:  Ben Sauter from Kobre Kim.

15        THE COURT:  Go ahead, counsel.

16        MR. SAUTER:  So just to begin, I'm going to walk

17  the Court through exactly how these were calculated so that

18  the Court and Your Honor can see how they are, in fact,

19  summaries of massive spreadsheets.  But before I do, some

20  background will be helpful, and I want to also put these

21  spreadsheets in context.

22        So the underlying data on which these summary

23  exhibits are based are not objected to.  So Verizon agrees

24  that they can come in as marked exhibits.  The catch is

25  there is no way -- it is impossible to present

1    understandable evidence about how the carriers are actually

2    using the antennas in these spreadsheets without doing a

3    summary exhibit, impossible.

4           So they will be in the record.  They will be

5    there, relevant critical evidence that goes directly to the

6    heart of the defense that they are asserting in the damages

7    case, and I'm going to get to some more of this when I get

8    to the background, but they are saying, we don't use

9    antennas in the way that Mr. Mills is saying we use them.

10          There is evidence in the record that they don't

11   object to that contradicts that, but there is absolutely no

12   way to convey that information to the jury without

13   presenting a summary exhibit.

14          Now, by way of background, I'm going to explain

15   why this exhibit was created when it was because I --

16   because it's important.

17          So we asked in discovery, and Verizon had an

18   obligation to produce independently of that, information

19   that was relevant to this case.  We asked them in

20   interrogatories to identify for us information about how

21   Verizon deploys antennas on its network.

22          What it produced to us initially were these ATOLL

23   spreadsheets, hundreds of them, all of them massive.  Okay.

24   We got to a 30(b)(6) witness deposition of Verizon and were

25   told he would be able to answer questions about these

1   spreadsheets.

2           As it turned out, he wasn't.  He said -- and I

3   have some quotes.  You know, I don't know how these

4   spreadsheets were compiled.  He said:  I can't vouch for

5   their accuracy.  So we asked on the record for the complete

6   spreadsheets.  They were -- and what was produced to us,

7   some of the columns -- and I'm going to explain to the

8   Court in a minute -- actually weren't filled out in the

9   initial spreadsheets that were given to us.

10          So there wasn't much we could do with those

11  initial spreadsheets.  They dragged their feet.

12          We eventually got the updated spreadsheets with

13  all the data after Mr. Cordaro, the 30(b)(6) witness had

14  testified.  So we weren't able to ask any questions about

15  them.  We got them about a week before Mr. Mills's expert

16  report was due.  We just -- I can't emphasize how big --

17  they crash computers, they're so big.

18          So these spreadsheets weren't done before his

19  report was completed.

20          Fast forward to the Daubert briefing in this case.

21  For the first time -- this argument never raised in any of

22  the fact depositions that were taken.  For the first time,

23  the Defendants file a Daubert motion saying Mr. Mills's

24  testimony should be excluded because it doesn't include

25  information about how the Defendants actually use antennas

1   on their network and that they use them on multiple

2   frequency bands at the same time.

3          Not only that, in CommScope's Daubert brief, they

4   say in a footnote, oh, and I understand the carriers are

5   going to produce their information about this and file

6   their own Daubert briefs contradicting it.  In fact,

7   there's actual evidence in the record that shows the

8   carriers don't deploy their antennas.

9          Well, that actually never happened.  The carriers

10  haven't put forth any of that evidence.  Okay.  The only

11  evidence that I'm aware of that goes to this at all is the

12  testimony of Mr. Zimmerman which we've already been through

13  and these spreadsheets, okay?

14         So in response to the factual contention in the

15  Daubert briefing that there was no evidence in the record,

16  and, in fact, the evidence contradicts our argument -- or

17  damages position that the carriers are using antennas on

18  multiple frequency bands.  We said:  Hey, is that right?

19  Is that really right?

20         So we went through these spreadsheets that we got

21  after Mr. Cordaro testified, right before Mr. Mills's

22  expert opinion was produced.  We went back and looked at

23  them.  This summary exhibit is the result of that.  We put

24  it together quickly in the context of that Daubert, not as

25  a -- to fix a Daubert issue, us trying to check the facts

1    of what they alleged in their Daubert briefs.  And we made

2    this exhibit.  That's the background with Mr. Mills.

3             We are not proposing to put it in.  We're not

4    trying to confuse the jury that this is expert testimony

5    that he's opining on anything.  The subjective opinion --

6             THE COURT:  Mr. Mills is a damages guy, right?

7             MR. SAUTER:  Mr. Mills is our damages expert,

8    that -- that's correct.  He's also somebody who is able to

9    compile these spreadsheets in a way that doesn't require

10   any particular expertise, but it's a massive project, and

11   he was able to do that.

12            THE COURT:  I guess my point is, I'd be more

13   suspect if he were a technical person than as an outsider,

14   quote, unquote, who doesn't do this who went through the

15   spreadsheets and made the calculations that are reflected

16   in this summary.

17            Go ahead -- go ahead and continue with your

18   argument.

19            MR. SAUTER:  Okay.  So just so Your Honor can -- I

20   think it's important.  I'm happy to -- to -- to explain for

21   Your Honor just -- just how we put it together.

22            So I don't have the entire spreadsheet here, but I

23   can show --

24            THE COURT:  Let me ask you this.  Are the

25   underlying spreadsheets going to be pre-admitted and used

1  as exhibits in the trial?

2          MR. SAUTER:  We agreed to that last night.

3  There's no objection to the underlying exhibits, that's

4  correct.

5          My point is it is many hundreds of them that

6  can't -- yes.

7          THE COURT:  I'm not asking about either/or.  I'm

8  asking about will we have both here?

9          MR. SAUTER:  Yes, Your Honor.

10          THE COURT:  Okay.  Go ahead.

11          MR. SAUTER:  This is -- as you can see, from the

12  column headers at the top of this document, I have, just

13  for purposes of illustration here, taken out some different

14  columns, because, like I said, it's hundreds of columns

15  long.  These are the relevant columns for -- for these

16  purposes.

17          One of the columns, Column A in these spreadsheets

18  says:  Site Name.  You see some numbers, and you see some

19  letters.  That's the identifier of a site, a particular

20  AT&T or a Verizon site.  The tower that you see on the side

21  of the road, that's what they call it.

22          Okay.  Next to that there's an Antenna Model, a

23  given name, so SBNHH-1D45A, that's an accused antenna model

24  in this case.  I'm going to explain in just a moment how I

25  got to these, walking through it.  Antenna model identifies

 1   a particular antenna model.  And not only that, it

 2   identifies a particular port within that antenna.

 3          The next column over, Antenna Altitude, it gives a

 4   very precise GPS coordinate of the antenna's altitude, a

 5   precise coordinate of the antenna's longitude, precise

 6   coordinate of the antenna's altitude, the sector in which

 7   the antenna is located.  The sector refers to whether it --

 8   usually these antenna sites are -- you have one antenna --

 9   there's three sides.  There's one, you know, north, one

10   west, one east.

11          So sectors -- what they call Sector 1, so you know

12   it's sort of on that same plane.  And the last column says

13   Band Class where they plug in a value of a particular

14   frequency band.

15          So I'm going to try to circle right there where my

16   arrow is, an Excel spreadsheet, if you click that, you can

17   filter.  So what you can do with these spreadsheets is you

18   can say I want to just look at what's going to at site name

19   N -- 0239 NM1_TAOSDT, that first segment in there.  You can

20   filter down and just see whatever is happening there.  And

21   after you do that, you can find -- you can figure out if

22   there's an accused antenna, and as it turns out in this

23   particular case, there is.

24          And after you do that, you can filter, and you can

25   say, well, I want to know all the antennas that are at a

1  particular latitude, longitude, altitude, sector.

2       So as you see here, you actually -- you have two

3  rows -- site name -- you have two rows for this TAOSOT

4  [sic].  Two -- the exact same antenna model, exact same

5  Port 6, exact same antenna altitude, exact same longitude,

6  exact same latitude, exact same sector.  The only

7  difference, one is PCS and one is AWS.

8       So all he has done -- he has just said that's --

9  that's his example of this exact same antenna, exact same

10  port being used on two different frequency bands.  He's

11  counted them up.  Nothing else.

12       I will stop there and answer any questions that

13  Your Honor has.  The T-Mobile summary exhibit is a little

14  bit different, so I can walk through how we calculated that

15  one, as well, if Your Honor would like.

16       THE COURT:  Let me ask you this.  If the

17  underlying spreadsheets are admitted as pre-admitted

18  exhibits and if they're available and used as exhibits at

19  the trial, and then this is used by Mr. Mills to explain to

20  the jury what he came up with from those stacks of

21  spreadsheets, how does that harm you if this is used as a

22  demonstrative rather than an exhibit?

23       You have the underlying data.  It's in the record.

24  You don't have a problem with proof.  And yet instead of

25  being forced to flip page after page after page of

1   thousands of sheets, you have as a demonstrative the

2   ability for him to testify as to what he did based on

3   those.

4         And by the same token, with them being

5   pre-admitted in the case, the other side can use them if

6   they think it's appropriate to cross-examine him on what

7   he's testified to from this summary sheet as a

8   demonstrative.

9         I'm asking Plaintiff how -- how is it materially

10  different for you if this is pre-admitted as an exhibit as

11  opposed to if it's used as a demonstrative in conjunction

12  with the underlying data spreadsheets?

13        MR. SAUTER:  Your Honor, I think that --

14        THE COURT:  Is it -- is it really any different?

15        MR. SAUTER:  No, I think that would be acceptable,

16  Your Honor.  He could testify as to what he did based on

17  those exhibits and this would illustrate his conclusions.

18        THE COURT:  What about Defendants?

19        MR. BARTON:  Well, Your Honor, the problem we have

20  with that is he didn't do this in his report.  This is the

21  first time -- this four-step or however many step

22  methodology that Mr. Sauter just went through, this is the

23  first time we've seen this.  This is not in his report.  He

24  didn't go through the ATOLL data, and so --

25        THE COURT:  This is not -- this is not opinion

1    testimony.  This is factual evidence of I took these

2    spreadsheets.  I went through them sheet-by-sheet-by-sheet.

3    This is what I -- this is what I did.  This is what I

4    counted.  And that's what's shown on this demonstrative.

5    That's not an opinion.  That's not required to be in his

6    expert report.

7            MR. BARTON:  With respect, Your Honor, we -- we

8    believe it is opinion because we were not able to get to

9    the same results.  This is not something -- there are

10   judgment calls made all along the way.  This is not simply

11   tabulating certain rows and certain fields and coming out

12   with, you know, the number of units sold, for example.

13           This is, as Mr. Sauter just explained, a

14   multi-step process where there were decisions applied along

15   the way to include or exclude certain things.  And if

16   Mr. Mills was a fact witness, I would say that they should

17   have identified him in their 26(a)(1) disclosures as a fact

18   witness.  They never did that.  He's always been offered

19   only as an expert witness.  And he never provided any

20   opinion testimony as to this.

21           If they wanted Mr. Mills to do this, and you heard

22   Mr. Sauter go through and describe the process by which he

23   believes we got to this point, they could have sought to

24   compel the deposition of Mr. Cordaro again.  They didn't do

25   that.  They could have moved for leave to supplement

1  Mr. Mills's report.  They didn't do that.

2          Instead, they want to come in here with an exhibit

3  that they're offering as a factual exhibit, based on a

4  series of steps and methodology that Mr. Mills applied that

5  we don't understand.  It does not appear to be kind of a

6  straightforward methodology.

7          We have no problem, Your Honor, because the ATOLL

8  data is coming in, right?  It's been pre-admitted.  That

9  if -- if a witness gets up for the Defendants and says,

10  well, they don't have evidence of X, then they can use the

11  ATOLL data to impeach that witness and say:  Well, in fact,

12  the evidence shows Y, right?  That's fine.

13          But for their expert to stand up and affirmatively

14  say here's what the evidence shows, even though he never

15  evaluated that evidence or provided any analysis of it in

16  his report, we think that's improper.

17          THE COURT:  Let me -- let me ask Plaintiff this.

18          Procedurally, is this testimony going to be

19  elicited from Mr. Mills at the same time he's offering his

20  expert testimony as a damages expert in this case, or are

21  you going to call him as a fact witness to go through his

22  non-expert testimony and then later in the case call him as

23  an expert witness to put on his damages expert testimony?

24          MR. SAUTER:  The latter, Your Honor.  And I also

25  want to just make one very quick clarification, which is

1   the T-Mobile exhibit -- T-Mobile actually reached out to us

2   after we did this, and we walked them through how we

3   calculated it.  Verizon did not do that.  So they have had

4   this exhibit for some time, and they have made a strategic

5   decision to not ask us about it.

6              THE COURT:  Gentlemen, I don't want to get into

7   bickering about what one side did and didn't do and so

8   forth and so on.  I think I've heard enough.

9              Based on the premise that the underlying

10  spreadsheets are without objection pre-admitted and can be

11  shown to the witness during the trial in which they will

12  become exhibits in the record, I -- and based on -- based

13  on that, I see no problem with the witness using these two

14  sheets as summaries of those voluminous records.

15             I think it's also helpful that he's going to be

16  actually on the witness stand at two different times during

17  the trial, so there'll be -- there'll be less possibility

18  of any confusion about this being offered as expert

19  testimony as opposed to fact testimony.

20             I do think for whatever reason Defendants should

21  have had an opportunity to depose Mr. Mills on this

22  particular item.

23             I'm going to -- I'm going to pre-admit PX-5086 and

24  5085, and I'm going to order Plaintiffs to make Mr. Mills

25  available for a one-hour deposition between now and the

1   time of jury selection, limited to these exhibits and the

2   underlying databases and spreadsheets that he used to

3   create these.  All right?

4       MR. BARTON:  Thank you, Your Honor.

5       THE COURT:  Bucket 41 is next, carrier purchase

6   contracts.  Let me hear from Defendants on this.

7       MR. FINDLAY:  Thank you, Your Honor.

8       This, to some extent, deals with the motion in

9   limine that we had filed on indemnification.  Your Honor

10  granted that as to liability that they not -- that the

11  Plaintiffs can't argue indemnification somehow equals

12  liability but denied it with some caution with respect to

13  possible mischief or anything like that.  And I don't want

14  to reargue that.

15      The two exhibits here -- and they are 4277 and

16  4788 -- are agreements between CommScope or prior companies

17  in interest and the carriers, one Verizon, one T-Mobile.

18      Plaintiffs seek to move these into evidence.  We

19  think they are irrelevant, and we think they are highly

20  prejudicial for a lot of the reasons that I indicated in my

21  argument on the motion in limine, which I won't repeat all

22  those.

23      But in addition to the indemnification, which I'd

24  like to show you in the agreement, there are other parts of

25  the agreement which I think would be incredibly prejudicial

1  if it were allowed into evidence.

2       And I can do it on the screen here.  This is --

3  it's VoiceStream Wireless and Andrew Corporation, but I

4  understand those are actually T-Mobile and CommScope in

5  terms of party of interest.

6       But, again, we don't think it's relevant to any

7  issues in the case.  And if you look down at some of the

8  language, even in addition to indemnification, there are

9  issues with large numbers thrown all around.  There's --

10  and we have the same problem.  I don't know if I want to

11  get into too much detail with the numbers, Your Honor.  You

12  can probably see them on the screen there.  I was going to

13  highlight them for you, but I won't to do that because it's

14  highly confidential.

15       But big numbers are thrown around for no relevant

16  reason whatsoever.  We would be concerned that that's what

17  would happen.  Jury sees these numbers.

18       And then just scrolling down farther, we get into

19  indemnification --

20       THE COURT:  Have you discussed -- have you

21  discussed with opposing counsel redacting those large

22  numbers?

23       MR. FINDLAY:  No, we have not, Your Honor,

24  because --

25       MR. WARD:  I'm sorry, Mr. Findlay.

 1          MR. FINDLAY:  Go ahead.

 2          MR. WARD:  We recall making that offer last night.

 3 There was a lot going on.  We're interested in the

 4 indemnity provisions of the contract, so --

 5          MR. FINDLAY:  And I apologize.

 6          MR. WARD:  That's okay.  That's --

 7          MR. FINDLAY:  I may have -- I may have missed that

 8 part.

 9          THE COURT:  So there's no problem from Plaintiff's

10 standpoint in redacting the numbers in the pricing section?

11          MR. WARD:  Correct, Your Honor.

12          MR. FINDLAY:  Well, that -- that helps.  Thank

13 you, Mr. Ward.

14          THE COURT:  Does that solve the problem,

15 Mr. Findlay, or are there still more problems?

16          MR. FINDLAY:  No, there's still more problems,

17 Your Honor.  You -- you did deny the motion in limine, and

18 I don't want to contradict myself on what I said a second

19 ago.  You denied the motion in limine and are going to

20 allow them to talk about indemnification and the

21 relationship between the parties generally.

22          This will just be in addition to -- we think not

23 relevant, prejudicial.  It's going to be cumulative.

24 There's nothing in here which the parties won't hear about.

25 And, again, just not to belabor the point, but there are --

1  there's a paragraph about infringement indemnity which

2  specifically talks about patent infringement cases.

3  There's another paragraph about indemnification in general.

4  It talks about we'll come in and take care of everything,

5  we'll pay for everything, you have some rights, et cetera.

6       We go down even farther, there's a whole paragraph

7  on insurance.  If the jury sees that -- well, maybe this is

8  speculation, but a concern that I would have, if a jury

9  sees that agreement, somebody starts reading insurance,

10  somebody thinks, oh, heck, you know what, there must be

11  insurance for this somewhere.  There's an insurance company

12  that's going to pay the damages for this patent

13  infringement that might arise.

14       It's just -- it's ramp with possibilities -- or

15  ripe with possibilities of confusion and doesn't add

16  anything substantive to their case.  You told them they can

17  tell the story of the fact that we are indemnifying them

18  and the relationship between the parties.

19       So at the very least, I think I would request that

20  it not be pre-admitted.  If they have a witness on the

21  stand and they think it somehow becomes relevant to

22  something, perhaps they can approach, or I would suggest

23  they approach and we can have that discussion at the bench,

24  but I don't think it's appropriate to pre-admit these.

25       Thank you, Your Honor.

1        THE COURT:  What's the Plaintiff's response?

2        MR. WARD:  Your Honor, maybe he didn't hear me.  I

3  know we were talking about several things.

4        We're interested in the indemnity provisions.  He

5  cited the two provisions that we're interested in showing

6  the jury.  We can redact the entirety of the rest of the

7  document.  We're interested in infringement, and it goes

8  hand in -- hand-in-hand with the indemnification, those

9  two -- it's indemnity for infringement, and then there's

10  another section dealing with indemnification.  And I'm

11  referring to PX-4788, and it's representative of the other

12  documents that are in this bucket.

13        Your Honor has denied the limine.  It is evidence

14  that is relevant to show bias.  And, yes, we could get that

15  testimony potentially from a corporate representative

16  called adversely from any of the parties to this case, but

17  we should be able to rely upon the documentary evidence

18  that -- that shows that fact, that shows the bias that is

19  potentially present, and the jury should be able to

20  consider that.

21        THE COURT:  All right.  I'm going to pre-admit

22  these documents.  I'm going to order that any numerical

23  amounts in the pricing section be redacted, and I'm going

24  to order that the entirety of the Paragraph 14 on insurance

25  be redacted.  Otherwise, the document is pre-admitted.

1          MR. FINDLAY:  Thank you, Your Honor.

2          THE COURT:  Okay.  Are we ready to move to

3    Plaintiff's objections as to Defendants' exhibits?

4          MS. RUIZ:  We are, Your Honor.

5          THE COURT:  All right.  Let's start with the first

6    bucket on non-party technical documents.  And let me hear

7    from Plaintiff as to their objections concerning the same.

8          MS. RUIZ:  Gabriela Ruiz for Fractus, Your Honor.

9          There's only one document at issue here, Your

10   Honor.  This is a sheet with specifications for -- a sheet

11   with specifications for an Allgon antenna that -- Allgon is

12   a non-party here, Your Honor.

13         Our objection is hearsay.  There's -- this

14   document was presented by -- it was used with an AT&T

15   witness in deposition, but it's not an AT&T document, and

16   there hasn't been any witness to overcome a hearsay

17   objection for business records or any other reason.

18         THE COURT:  What's Defendants' response?

19         MR. BREMER:  Your Honor, Dennis Bremer.

20         AT&T's witness under 30(b)(6) capacity was deposed

21   in connection with several topics, one of which was his

22   knowledge because he was there at the time of AT&T's use of

23   antennas on different bands, the low band and the high

24   band, which he testified that was done in the -- certainly

25   by 1999.  And when asked what basis he had other than his

1  personal knowledge from being there at the time, he

2  identified this document that from their files -- an Allgon

3  document.  Allgon is a supplier of antennas, Your Honor.

4           In fact, Mr. Lindmark, who was associated with the

5  Lindmark NRS reference in connection with summary judgment

6  motions a couple weeks ago, worked at Allgon at this time

7  period.

8           But the witness testified that these came from the

9  AT&T files, had a date mark in their files of 1999, and he

10  pointed to that as proof as it were that they were

11  employing using antennas and two bands.  That's what we

12  intend to use it for, not that this particular antenna

13  worked that way.  But that's what happened.

14          And we anticipate -- if necessary, if it can't be

15  pre-admitted, that perhaps we'd be able to authenticate

16  that in connection with Mr. Lindmark's testimony.

17          THE COURT:  All right.

18          MS. RUIZ:  Your Honor, may I add something?

19          THE COURT:  You may.

20          MS. RUIZ:  Your Honor, I'll note that the patterns

21  here are the same kind of patterns that the Court excluded

22  from Dr. Long's testing results.  They're

23  machine-generated.  There's been -- in this situation,

24  there's been no one to testify in deposition as to the

25  reliability of -- of those results.

1            And, again, Your Honor, I just reiterate that just

2    the fact that this document was in AT&T files does not make

3    it an AT&T business record.  And there was no -- it was

4    not -- there were no questions in deposition, even if it

5    had been in an AT&T record, to establish it as a -- as a

6    business record for the hearsay exception, Your Honor.

7            THE COURT:  All right.  I'm going to sustain the

8    objection.  I think that's consistent with my ruling on the

9    other side, and I think there's a risk of confusion,

10   whether it's AT&T or this other entity, being shown to the

11   jury.

12           Anyway, it's -- it's -- it's not pre-admitted.

13           Let's go to Category 10.  That should already be

14   covered, is it not?  I'm told it would rise and fall with

15   the other ruling.

16           MR. BREMER:  Yes, Your Honor.

17           THE COURT:  Okay.  So consistent with the other

18   ruling, those documents are not pre-admitted.

19           Everyone agree with that?

20           MR. BREMER:  Yes.

21           MS. RUIZ:  Yes, Your Honor.

22           MR. STAMATOPOLOUS:  Yes, Your Honor.

23           THE COURT:  Okay.  Then that brings us to Category

24   18 of Defendants' exhibits, patents by Fractus or owned by

25   Fractus.

1          Let me hear from Plaintiff's counsel on this.

2          MR. STAMATOPOLOUS:  Thank you, Your Honor.

3          There is one document in this category, DX-301 out

4   of the '206 patent.  This is a patent that's been -- it's a

5   Fractus patent.  It describes a type of antenna array.  And

6   it came after -- it was issued after the patents that are

7   at issue -- or rather the patent that is at issue in the

8   case right now.

9          It contains language that says that the dual band

10  behavior to which the array of the patent is directed is

11  difficult to attain for a particular frequency ratio.

12         And the concern is that Defendants are going to

13  use this language to challenge -- to pose a written

14  description challenge to the -- to the Fractus patent at

15  issue in the case.

16         Now, the standard for written description is

17  whether a person -- a person of ordinary skill in the art

18  would recognize that Fractus possessed the claimed

19  invention based on the four corners of the specification of

20  the patent at issue --

21         THE COURT:  Just -- just to clarify, counsel, this

22  is not an elected prior art reference?

23         MR. STAMATOPOLOUS:  No, it is not, Your Honor.

24         THE COURT:  Okay.

25         MR. STAMATOPOLOUS:  And so there's -- there's

1    precedent for that.  There's Federal Circuit precedent.
2    And it's on this basis that we are objecting, that the
3    prejudice of this document outweighs its probative value.
4    And, of course, its relevance, as well.
5         THE COURT:  402/403.  Anything else?
6         MR. STAMATOPOLOUS:  That's it.
7         THE COURT:  Let me hear a response from Defendant.
8         MR. TOBIN:  Good morning, Your Honor.  David Tobin
9    for Defendants.
10        First off, I'm happy -- it looks like they've
11   withdrawn their hearsay objection, which is -- which is
12   good.  But, yes, it is one document.
13        And, Mr. Patterson, could you put it up on the
14   screen, please?  It's Document No. DX-1457.
15        And, Your Honor, a couple of things.  So to deal
16   with the relevance issue, first off, I'll note that this is
17   another Fractus patent.  It's by -- if you look at the
18   first inventor here, it's Carles Puente Baliarda, who is
19   the named inventor.  Fractus was coming to trial -- testify
20   as their -- as their corporate witness.  And the -- it is
21   squarely relevant for written description, Your Honor.
22        The Defendants' experts, including Mr. Acampora,
23   have cited to this document multiple times as evidence of
24   lack of written description.
25        This document was filed after the patents-in-suit,

1    and it actually criticizes the patents-in-suit and some of

2    the shortcomings in the patents-in-suit.  It specifically

3    mentions the family of -- of the patents-in-suit and talks

4    about what their -- some of the disadvantages of that

5    patent.

6          So it's a statement by Fractus -- by Mr. Puente in

7    a government-issued document and is squarely relevant to

8    the written description issue, Your Honor, and enablement.

9          THE COURT:  Show me the section of this that

10   criticizes directly.

11         MR. TOBIN:  Yes, Your Honor.

12         Mr. Patterson, I think, it's on Page -- around

13   Column -- around Column 2 at the bottom.  Can you scroll up

14   a couple of pages, please?  Can you -- I'm sorry, zoom --

15   zoom out?

16         I'm sorry, Your Honor.

17         I think it may be around Column -- let me go --

18   can I be -- it's hard to see it on this, Your Honor.  May I

19   be excused for a moment?

20         THE COURT:  You -- you may.

21         MR. TOBIN:  Sorry to waste your time.  Thank you.

22         Your Honor, thank you for your indulgence.  I

23   apologize for that.

24         But we are looking at -- I believe this is Column

25   2, around Lines 25 to 27, Your Honor.  And this document

1  was directly addressed in the expert reports, and it was
2  brought up at the deposition of their corporate witness,
3  Dr. Puente.  It wasn't challenged then, but the part I'm
4  looking at is around Line 26, Column 2.  Do you see, Your
5  Honor, where it says PCT/ES/99/00343?  That's the parent
6  application that led to all the asserted interlaced patents
7  in this case.  And it talks about how it is difficult to
8  achieve a dual band behavior following the description of
9  the family of the patents-in-suit.
10         And one of the arguments that had been raised by
11 Defendants' experts, Your Honor, using this document
12 multiple times, have not been challenged, is that the
13 patents-in-suit do not enable and do not provide written
14 description for multiband behavior using the teachings of
15 that patent.
16         And this is a Fractus admission about the
17 teachings of its own patent that has been discussed
18 multiple times in the Defendants' expert reports.  And this
19 is really, I think, Your Honor, an attempt to challenge
20 some of the expert opinions at this late stage that have
21 not been challenged before.
22         THE COURT:  I didn't follow that.  An attempt by
23 whom to challenge expert opinions that haven't been
24 challenged before?
25         MR. TOBIN:  I'm sorry, Your Honor, for -- for

1  not -- an attempt by Fractus.  Again, this specific passage

2  wasn't just cited in a footnote of some expert reports,

3  Your Honor, it was discussed repeatedly in the text of

4  Defendants' invalidity expert reports for written

5  description and enablement -- lack of enablement.

6           THE COURT:  Do you have anything else for me?

7           MR. TOBIN:  Not at this time, Your Honor.

8           THE COURT:  Does Plaintiff have anything else on

9  this?

10          MR. STAMATOPOLOUS:  Your Honor, Defendants'

11  experts can certainly testify using the document to show

12  that it was difficult to attain multiband behavior, dual

13  band behavior using the Fractus patent at issue in the

14  case.

15          However, it would be extremely prejudicial to

16  actually admit this document into evidence that the jury

17  can then go back to and use this somewhat, we submit, if

18  not cryptic, then definitely not conclusive statement as to

19  whether the patents -- or rather the claimed inventions are

20  enabled in the patent.

21          Thank you.

22          THE COURT:  I'm going to sustain the objection.

23  This is not pre-admitted.  It can be used by the expert as

24  a demonstrative during their testimony.  I think there is

25  some risk of confusion to the jury, given that this is a

1   Fractus patent and the lawsuit is based upon a Fractus

2   patent.  I don't find it to be unusual that a later patent

3   would say it's an improvement on what came before it.  I

4   don't think that's necessarily relevant to whether or not

5   the prior patent meets the enablement and written

6   description requirements of the Patent Act.

7          So I think there is some reduced, if more than

8   minimal relevance.  I think there's some risk of confusion,

9   and I don't think the Defendant is materially prejudiced by

10  using it only as a demonstrative rather than to admit it as

11  an exhibit.  So for those reasons, at least, I'll sustain

12  the objection.

13         All right.  Are there other exhibits in dispute

14  that we've not taken up and considered?

15         MR. BREMER:  I think not, Your Honor.  But may I

16  consult with my colleague?

17         THE COURT:  Please consult.  It's better to find

18  out now than later.

19         Counsel, do you need some more time, or do we know

20  where we are?

21         MS. RUIZ:  Your Honor, may I --

22         THE COURT:  Please.

23         MS. RUIZ:  Your Honor, we don't have any further

24  disputes for the Court to take up on the exhibits.

25         We just wanted to clarify that on the meet and

 1   confer last night, the parties entered into several

 2   agreements to resolve the buckets, and so we're going to be

 3   working together to -- to -- to put -- to put together our

 4   exhibit list, make sure they're accurate, exchange them,

 5   that we're complying with those agreements with each other.

 6            There are a couple of agreements that I'd like to

 7   put on the record, if that's acceptable to the Court.

 8            THE COURT:  All right.  What agreements do you

 9   have?

10            MS. RUIZ:  On -- on Bucket -- let's see, Bucket 12

11   of Plaintiff's objections to Defendants' exhibits, those

12   were the Fractus claim charts.  There were certain exhibits

13   in there that were claim charts for the -- the Samsung --

14   the products that Samsung sold to Sprint which relate to

15   marking.

16            The parties are going to work out a stipulation

17   with respect to Fractus's position that we are not

18   disputing that those are patented articles under Section

19   287(a), and so we're working on the exact language, but

20   Defendants agreed to withdraw those claim charts based on

21   the agreement that we would be entering into that

22   stipulation.

23            THE COURT:  All right.  Defendant concur with that

24   representation?

25            MR. BREMER:  Yes, Your Honor.

 1            THE COURT:  All right.  Do you have other

 2   agreements, Ms. Ruiz?

 3            MS. RUIZ:  Yes, Your Honor.  Defendants'

 4   objections to Plaintiff's exhibits on Bucket 4, this is for

 5   carrier -- related to carrier revenue.  There was an

 6   agreement that the exhibits are subject to the Court's

 7   order on the motion in limine on this issue and that

 8   Fractus will redact the exhibits accordingly, and

 9   Defendants will review those redactions.

10            On Bucket 8, relating to expert testimony on use,

11   there was an agreement that the exhibits must be in the

12   expert report in order to come in, and that Fractus will

13   redact, according to the Court's ruling on relevant MILs.

14            On Bucket 12, file type, there was an agreement

15   that Fractus -- to the extent Fractus intends to use any

16   files that Defendants cannot view, Fractus would provide

17   software for Defendants to view those files.

18            And also to the extent any exhibit may be

19   incomplete and Defendants identify those for Fractus,

20   Fractus will provide complete exhibits in order for them to

21   be pre-admitted or to remain on the exhibit list.

22            THE COURT:  All right.  Do Defendants concur with

23   that representation?

24            MR. BREMER:  Yes.

25            MS. RUIZ:  On Bucket 13 which was relating to AT&T

1 documents, the parties agreed that the stipulation that --

2 that we entered into yesterday would govern those

3 documents, and specifically Ms. -- PX-91 was withdrawn,

4 but -- but the general stipulation is that yesterday's

5 stipulation governs that bucket.

6          I believe that's the extent of our agreements that

7 we wanted to put on the record.

8          THE COURT:  Do Defendants concur with that last

9 agreement as Ms. Ruiz recited it regarding Bucket 13?

10          MR. BREMER:  Yes, exhibits governed by the

11 stipulation -- it will be governed by the stipulation and

12 pre-admitted, but Exhibit 91 will be withdrawn.

13          THE COURT:  All right.  Are there other agreements

14 that need to be recited into the record?

15          MS. RUIZ:  I don't believe so, Your Honor.

16          MR. BREMER:  No, Your Honor.

17          THE COURT:  All right.  Then I'll direct the

18 parties to work with the courtroom deputy to see that a

19 complete and finalized universe of pre-admitted exhibits

20 are prepared and delivered and available before the trial

21 begins.

22          Let me just make it clear.  Whatever Ms. Lockhart

23 tells you is what I want you to do, okay?

24          Are there other matters related to pre-trial that

25 need to be raised with the Court?

1            Mr. Ward?

2            MR. WARD:  One -- one item, Your Honor.  We just

3       really need a deadline or hopefully the Court will give us

4       a deadline for identifying those witnesses that will be

5       called live at trial.

6            There are currently 31 witnesses on the

7       Defendants' may call list who are designated as live

8       witnesses.  There are others that are designated as

9       deposition.  And we can obviously deal with the deposition

10      folks, but it's difficult to prepare our trial when there's

11      31 folks on that may call who are live witnesses.

12           And we've got ours pared down to eight that are

13      live witnesses on the may call.  We told them who our will

14      calls are.  And we've been meeting and conferring and

15      brought this up multiple times.  So we're hoping the Court

16      would say by X date, let's have an exchange of who really

17      is a potential live witness.

18           THE COURT:  What do Defendants say about this?

19      What do you think is realistic for you to be more specific?

20           MR. FINDLAY:  I think I would ask for -- let us

21      confer for several days.  Perhaps by Wednesday of next

22      week, we get back with a much more pared down, ready-to-go

23      list, Your Honor.  That -- that's a week and a day before

24      trial begins, which I think is adequate time.

25           THE COURT:  This is Friday.

1          MR. FINDLAY:  Yes, sir.

2          THE COURT:  Tuesday at 5:00 p.m.

3          MR. FINDLAY:  Understood.

4          THE COURT:  All right?

5          MR. FINDLAY:  Will do.  Thank you, Judge.

6          MR. WARD:  Thank you, Your Honor.

7          THE COURT:  Any other matters that we need to take

8  up?

9          Mr. Kubehl?

10          MR. KUBEHL:  Good morning, Your Honor.

11          I appreciate the -- Your Honor is not taking up

12  exhibit issues with respect to the T-Mobile and Verizon

13  cases that may occur in the future.  We have done a lot of

14  work, both the Plaintiff and T-Mobile and Verizon to --

15          THE COURT:  It's my sincere hope that what you've

16  seen and observed with regard to the CommScope case will

17  inform you as to those later cases, and we can save a lot

18  of the time that's been expended in this instance.

19          MR. KUBEHL:  Yes, Your Honor.  My -- my point is

20  that a lot of that work has been done, and there's been a

21  lot of horse trading that's happened in -- between the

22  CommScope, the T-Mobile, and the Verizon cases where

23  accommodations have been made, and we've got a collection

24  of exhibits where there are no objections in the T-Mobile

25  case.  And I expect in the Verizon case, as well.

1          And I would just like a memorialization that to

2     the extent we have those agreements and exhibits that are

3     not objected to, that those would be deemed pre-admitted so

4     that we don't have a situation where we've made

5     accommodations and horse trades in the CommScope case that

6     have affected the T-Mobile case, and then later those are

7     rethought and -- and new objections are raised.  If -- if

8     they're not objected to now, it seems like they ought to be

9     considered pre-admitted.

10         And we've given them a list of those exhibits.  We

11    can work with them to make sure that that is the correct

12    list, and we've proposed to submit that to the Court with

13    the recognition that there are still some exhibits to work

14    on.

15         THE COURT:  What's the Plaintiff say?

16         MR. WARD:  Your Honor, we're obviously willing to

17    work with the other side.  We were here until almost

18    midnight last night on the CommScope case, so we haven't

19    had a chance to -- we're struggling with this exhibit list.

20    We're happy to work with them.  We're not going to renege

21    on agreements that we've made.  And I don't foresee a

22    problem.  So we'll submit that list once we have it

23    prepared and are ready to do it.

24         THE COURT:  I would be very up -- very surprised

25    and disappointed if there were backtracking going on.  By

1   the same token, I understand Plaintiff's reluctance to say

2   absolutely beyond all doubt right now these are locked in

3   right now, given the focus has been solely in the Comm --

4   on the CommScope case.  I think just like some of these

5   other matters, you ought to have your own deadline or I'll

6   give you one by which you can put a finalization on that.

7   It shouldn't wait.  It should go ahead and get done.  But

8   I'm not trying to say Plaintiffs have to say now -- you

9   know, yes or no now and forever right now as you stand

10  here.

11          MR. WARD:  Thank you, Your Honor.

12          THE COURT:  If you all need some guidance from me

13  on getting a deadline by which you get that done, let me

14  know.  Otherwise, I'll assume good lawyers will take care

15  of it and not bring it back to me as a problem.

16          MR. KUBEHL:  I hope we'll prove ourselves as good

17  lawyers, Your Honor.

18          MR. WARD:  We understand your direction.  Thank

19  you, Your Honor.

20          THE COURT:  Okay.  All right.  Are there other

21  matters related to anything concerning pre-trial in the

22  CommScope case that haven't been taken up yet and need to

23  be?

24          MR. WARD:  Nothing from the Plaintiff.

25          MR. FINDLAY:  Nothing from CommScope.

1            THE COURT:  Then that will complete the pre-trial

2    process.

3            Counsel, as I told you yesterday in chambers, I

4    look forward to a civil, professional, and interesting

5    trial.  There's a lot of evidence.  There are a lot of

6    witnesses.

7            The Court expects counsel to work toward a common

8    goal of making this trial clear and uninterrupted for the

9    jury, and I have every confidence that that will be what we

10   have.

11           I will see you -- if not before on other matters,

12   I will see you for jury selection on the 3rd of October.

13           The Court stand in -- Mr. Ward?

14           MR. WARD:  I'm sorry, Your Honor.

15           One question, and I meant to ask this earlier.  Is

16   there a time by which we can get the list of the panels for

17   the venire and the jury questionnaires in advance?

18           THE COURT:  Same process as always, Mr. Ward.  You

19   need to work with the deputy in charge.  She typically --

20   on a Monday morning jury selection, those typically are

21   made available Thursday.  This is a Thursday jury

22   selection.  Let Ms. Clendening work with you on a similar

23   early delivery of that information.

24           MR. WARD:  Thank you, Your Honor.

25           THE COURT:  Okay.  We stand in recess.

1          COURT SECURITY OFFICER:  All rise.

2          MR. FINDLAY:  Thank you, Your Honor.

3          (Hearing concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes                        9/25/19
    SHELLY HOLMES, CSR, TCRR                  Date
10  OFFICIAL REPORTER
    State of Texas No.: 7804
11  Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25